CITY BANK FARMERS TRUST COMPANY, Respondent, *v.* BETHLE-
HEM STEEL COMPANY, Appellant.

First Department, May 31, 1935.

*William D. Whitney* of counsel [*Hoyt A. Moore* with him on the
brief; *Cravath, De Gersdorff, Swaine & Wood*, attorneys], for the
appellant.

*C. Alexander Capron* of counsel [*Kendall M. Barnes* with him on
the brief; *Mitchell, Taylor, Capron & Marsh*, attorneys], for the
respondent.

GLENNON, J.   This is an appeal from an order, entered at Special
Term, which granted summary judgment to the plaintiff.   In its
answer the defendant set up the Federal statutes which were recently
enacted and now in force, governing the question of currency.

There is little, if any, dispute between the plaintiff and the defend-
ant as to the facts.   We must determine on this appeal the effect
of the gold clause resolution adopted on June 5, 1933, in so far as it
pertains to this controversy.

The plaintiff was organized under the laws of the State of New
York, and the defendant was created by and under the laws of the
State of Pennsylvania.   The action is at law and is based upon the
refusal of defendant to pay to the plaintiff a sum in excess of $1,500
to cover sixty coupons which were detached from certain of the
defendant's bonds issued in 1912.   The defendant is engaged in

business exclusively in the United States. It is paid for its output in the currency of this country. The plaintiff, as trustee, purchased in the United States the bonds from which the coupons were detached. The coupons provided: " Bethlehem Steel Company will pay to Bearer at its office or agency in the City of New York, U. S. · A., Twenty-five Dollars United States Gold Coin, or in London, England, Five Pounds, Two Shillings, Ten Pence, or in Amsterdam, Holland, Sixty-two Guilders, Twenty-five Cents, being six months' interest then due on its First Lien and Refunding Mortgage Five Per Cent. Thirty-Year Gold Bond, Series A, No. ....." The bonds contained similar provisions. The plaintiff, well knowing that, if it presented the coupons in New York for payment, it would receive the sum of $1,500 which the defendant was prepared to pay, tendered the coupons to defendant's agent in Amsterdam, Holland, and demanded the dollar equivalent of Dutch guilders, which amounted to the sum of $2,437.09. The guilder is on the gold basis. Under the old parity a coupon of the value of $25 equaled 62¼ guilders, whereas, now the same coupon has a value of about 38⅓ guilders. It is conceded that the defense is based on the several statutes and executive orders of the Federal government relating to the currency, and primarily upon Public Resolution No. 10 of the 73d Congress, approved June 5, 1933. (31 U. S. C. A. § 463; 48 U. S. Stat. at Large, 113.)

We believe that the points made by the appellant are sound and that the judgment should be modified.

In stating our reasons we do not think it necessary to refer to the history leading up to the enactment of the various statutes and the executive orders of the Federal government, since they are so ably covered in the comprehensive and exhaustive opinions of Mr. Chief Justice HUGHES in the gold clause cases (*Norman* v. *Baltimore & Ohio Railroad Co.*, 294 U. S. 240; *Nortz* v. *United States*, Id. 317; *Perry* v. *United States*, Id. 330). Perhaps it might not be amiss, however, to quote from the opinion of the Chief Justice in order to understand the basis of our decision. In *Norman* v. *Baltimore & Ohio Railroad Co.* (*supra*, 315) he said, in part: " The devaluation of the dollar placed the domestic economy upon a new basis. In the currency as thus provided, States and municipalities must receive their taxes; railroads, their rates and fares; public utilities, their charges for services. The income out of which they must meet their obligations is determined by the new standard. Yet, according to the contentions before us, while that income is thus controlled by law, their indebtedness on their ' gold bonds ' must be met by an amount of currency determined by the former gold standard. Their receipts in this view, would

be fixed on one basis; their interest charges, and the principal of their obligations, on another. It is common knowledge that the bonds issued by these obligors have generally contained gold clauses, and presumably they account for a large part of the outstanding obligations of that sort. It is also common knowledge that a similar situation exists with respect to numerous industrial corporations that have issued their ' gold bonds ' and must now receive payments for their products in the existing currency. It requires no acute analysis or profound economic inquiry to disclose the dislocation of the domestic economy which would be caused by such a disparity of conditions in which, it is insisted, those debtors under gold clauses should be required to pay one dollar and sixty-nine cents in currency while respectively receiving their taxes, rates, charges and prices on the basis of one dollar of that currency." That portion of the joint resolution which is particularly applicable to this case reads as follows: " Every obligation heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts."

The bonds and coupons which were issued by the appellant are obligations payable in the money of the United States. While they provide for payment in sterling or guilders, they are, nevertheless, within the spirit and intent of the joint resolution. It is not contended by the appellant that the holders of these coupons, who are subjects of England and Holland, respectively, are governed by the terms of the joint resolution. In fact, the affidavits show that all payments have been made to *bona fide* holders in foreign countries in accordance with the terms of the agreement. It is claimed, however, and rightfully so, that the citizens of our country are controlled by the terms of the joint resolution particularly where, as here, the bonds were purchased in the United States by citizens thereof, and the parties who purchased them expected to be paid in dollars, the value of which was not to be governed by the currency of any other country. It would be exceedingly unjust to compel the appellant to meet its obligations on the basis of the old standard, when the entire income from its business is received in the existing currency.

We do not believe that it should be the policy of our courts in a litigation between two of our citizens to construe that part of the resolution which is applicable to this case in a manner which may tend to nullify and destroy the legislative intent. Equity and justice demand that all who live under and enjoy the benefits of our government and its laws should be placed upon an equal footing, at least

in so far as our currency is concerned. Mindful of its underlying purposes, good citizenship requires that the resolution should be accepted in a spirit which will not permit an unfair advantage to the creditor at the expense of the debtor.

The judgment and order appealed from should be modified by reducing the amount of the judgment as entered to the sum of $1,500, and as so modified affirmed, with costs of this appeal to the appellant.

MARTIN, P. J., and TOWNLEY, J., concur; MERRELL, J., dissents and votes for affirmance.

MERRELL, J. (dissenting). I am unable to agree with the opinion of Mr. Justice GLENNON, writing for a majority of the court, for reversal of the order and judgment appealed from herein. Unless we are to brush aside and ignore the plain and unambiguous provisions of the contract between the parties, the order and judgment appealed from were right, and should be affirmed. The undisputed facts are as follows:

Plaintiff, as trustee of certain express trusts, held sixty coupons issued by the defendant, which, by their terms, became due and payable on November 1, 1933. Each coupon held by plaintiff was in the following form:

" On the First day of November, 1933, unless the bond hereinafter mentioned shall have been called for previous redemption, Bethlehem Steel Company will pay to Bearer at its office or agency in the City of New York, U. S. A. Twenty-five Dollars $25 00 United States Gold Coin, or in London, England, Five £5 2 10 Pounds, Two Shillings Ten Pence, or in Amsterdam, 62.25 Holland, Sixty-two Guilders, Twenty-five Cents, being Guilders six months' interest then due on its First Lien and Refunding Mortgage Five Per Cent. Thirty-Year Gold Bond, Series A, No. [Number of bond to which coupon was attached.]

" B. H. JONES

" $25                                    Treasurer."          No. 43

On November 17, 1933, plaintiff caused the said coupons to be presented at the office of the defendant in Amsterdam, Holland, and demanded payment as to each coupon in the sum of 62 guilders and 25 cents, or, in all, 3,735 guilders. On the day of presentation the guilders were of the total value of $2,437.09. The last-mentioned sum the court, in the judgment appealed from, awarded to plaintiff, with interest and costs.

Only questions of law are presented upon this appeal. It is the contention of the defendant, appellant, that by virtue of the

so-called Gold Clause Resolution adopted by the Congress on June 5, 1933, the plaintiff was confined to demanding payment in coin of the United States. It is not claimed by appellant that the procedure of the court in granting summary judgment was in anywise irregular or that the defendant was entitled to the trial of any issue. Plaintiff, respondent, contends that, under the express terms of the coupons themselves, the defendant agreed to pay to the holder of each coupon 62 guilders 25 cents upon presentation thereof at the office or agency of the defendant in Amsterdam, Holland, and that such coupons having been duly presented by the plaintiff on November 17, 1933, the obligation of the defendant to pay said coupons in guilders became absolute. It is the further contention of the plaintiff, respondent, that the Gold Clause Resolution of the Congress had no effect whatever upon this contract, and that such resolution applied only to " obligations " payable in money of the United States. The Gold Clause Resolution adopted by the Congress and approved June 5, 1933, in its recital and enactment provided as follows:

" (PUBLIC RESOLUTION — No. 10 — 73D CONGRESS)

" (H. J. Res. 192)

" Joint resolution

" To assure uniform value to the coins and currencies of the United States.

" WHEREAS the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

"WHEREAS the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

" *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,*

" That (*a*) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred.

Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

" (b) As used in this resolution, the term ' obligation ' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term ' coin or currency ' means coin or currency of the United States including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations.

" Sec. 2. The last sentence of paragraph (1) of subsection (b) of Section 43 of the Act entitled 'An Act to relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency, to provide emergency relief with respect to agricultural indebtedness, to provide for the orderly liquidation of joint-stock land banks, and for other purposes,' approved May 12, 1933, is amended to read as follows:

"All coins and currencies of the United States (including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations) heretofore or hereafter coined or issued, shall be legal tender for all debts, public and private, public charges, taxes, duties, and dues, except that gold coins, when below the standard weight and limit of tolerance provided by law for the single piece, shall be legal tender only at valuation in proportion to their actual weight.

"Approved, June 5, 1933, 4:40 P. M."

Under subdivision (b) of the first section of the resolution it appears that the Congress was dealing only in the coin or currency of the United States. With this in mind, it will be seen that the resolution related only to obligations payable in the money of the United States in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, and which was declared to be against public policy. The resolution further states that every obligation (payable in money of the United States) heretofore and hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment,

dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. The " coin or currency " referred to in the resolution, according to subdivision (b) of the first section of the resolution, means coin or currency of the United States. The intent of the Congress, reading the resolution as a whole, seems to me to be perfectly clear. The resolution is carefully limited to obligations " payable in money of the United States," and payable in " a particular kind of coin or currency of the United States." There is no intention on the part of the Congress to extend the resolution to obligations payable in foreign countries in a foreign currency. The absence of any such intention is clearly shown by the preamble of the resolution, which stated as follows:

" WHEREAS the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it * * * "

The resolution itself is clear and unambiguous and should not be extended by interpretation or construction to include any reference to obligations other than those which are payable in money of the United States. Under well-recognized constitutional limitations the Congress had no power to extend the scope of the resolution so as to give it extraterritorial effect. Section 8 of article 1 of the Constitution invests the Congress with the power " to coin money, to regulate the value thereof, and of foreign coin, and fix the standard of weights and measures." It was by virtue of such constitutional provision that the Gold Coin Resolution was passed. There is no other provision of the Constitution justifying the adoption of the resolution than that referred to. The preamble of the resolution clearly indicates the purpose of the Congress to enact the legislation in question. In the preamble reference is made to " the power of the Congress to regulate *the value of the money of the United States.*" (Italics are the writer's.) Neither the power of the Congress to regulate the value of the money of the United States nor " the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts," has any application to the contract here involved, which

contract provided expressly for the payment of the coupons in guilders at Amsterdam, Holland, in case the holder exercised its option to present the same for payment there. In adopting this resolution the Congress recognized that it could not make this law effective in a foreign country. The Congress must have recognized that its declaration as to the American public policy had nothing to do with contracts to be performed abroad. It was held in *Ewen* v. *Thompson-Starrett Co.* (208 N. Y. 245, 247) that the rule is that an intention would not be inferred from general language of an act to give it extraterritorial effect. Under well-considered authority the resolution in question should be construed as applicable only to obligations payable in money of the United States. In *United States* v. *Jin Fuey Moy* (241 U. S. 394) Mr. Justice HOLMES said (at p. 401): " A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." The same idea was expressed by Judge HISCOCK of our Court of Appeals in *Hovey* v. *De Long Hook & Eye Co.* (211 N. Y. 420, 429). It seems to me that the resolution adopted by the Congress was clear and unambiguous, and should be interpreted without the aid of extrinsic evidence. Extrinsic evidence can only be received to resolve an ambiguity, not for the purpose of creating one. In *Mayor, etc., of N. Y.* v. *Manhattan R. Co.* (143 N. Y. 1) Judge PECKHAM stated (at p. 20): " It is a waste of time to cite the general canons of construction which obtain in the discharge of the judicial duty to construe an act of the Legislature. They are familiar to us all and they result in the question, what is the real meaning of the enacting body? That meaning is to be first sought in the language used, and if that be plain, unambiguous and imperative, there is nothing left for the courts other than to obey the directions of the statute as manifested by its language." In *Woollcott* v. *Shubert* (217 N. Y. 212) Judge COLLIN, writing for the Court of Appeals, said (at p. 222): " The Supreme Court of the United States has declared the rule that the formal reports of legislative committees relating to a bill in the course of progress are competent sources from which to discover the meaning of the language employed in a statute (*McLean* v. *United States*, 226 U. S. 374, 380; *Lapina* v. *Williams*, 232 U. S. 78, 90), but cannot be resorted to for the purpose of construing a statute contrary to its plain terms. (*Penn. R. R. Co.* v. *International Coal Mining Co.*, 230 U. S. 184, 199.) " The appellant seeks to explain the intent of the Congress in adopting the resolution in question by showing certain debates had in the Congress at the time of its adoption. However, these debates are of little importance, and only go to show the personal opinion of the members of

Congress engaging in debate. Judge COLLIN in *Woollcott* v. *Shubert* (*supra*, at pp. 221, 222), referring to the extent to which the debates might be considered, stated: " It is established law, however, that the statements and opinions of legislators uttered in the debates are not competent aids to the court in ascertaining the meaning of statutes. ( *United States* v. *Trans-Mo. Freight Association*, 166 U. S. 290, 318; *Dunlap* v. *United States*, 173 U. S. 65, 75; *Lapina* v. *Williams*, 232 U. S. 78, 90; *Omaha & C. B. Street Ry. Co.* v. *Interstate Commerce Com.*, 230 U. S. 324, 333.) " If there was any ambiguity in the express terms of the resolution, then what occurred at the time the resolution was adopted in the Congress might be of some importance. I find no such ambiguity. There have been certain decisions construing the gold clause in question. In *Norman* v. *Baltimore & Ohio Railroad Co.* (294 U. S. 240) Chief Justice HUGHES, writing for the United States Supreme Court, discussed the power of Congress to establish a monetary system. Throughout the opinion of Chief Justice HUGHES emphasis is placed upon the monetary policy of the Congress with reference to the power given to the Congress by the Constitution " to coin money, to regulate the value thereof  *  *  *." In the last paragraph of the opinion of Chief Justice HUGHES it was stated: " We are concerned with the constitutional power of the Congress over the monetary system of the country and its attempted frustration. Exercising that power, the Congress has undertaken to establish a uniform currency, and parity between kinds of currency, and to make that currency, dollar for dollar, legal tender for the payment of debts. In the light of abundant experience, the Congress was entitled to choose such a uniform monetary system, and to reject a dual system, with respect to all obligations within the range of the exercise of its constitutional authority." Nowhere in the decisions, so far as I have been able to discover, has there been any suggestion indicating that the United States Supreme Court entertained the view that the Gold Clause Resolution applied to anything, except " an obligation payable in money of the United States." The only conclusion which can be drawn is that Congress legislated and intended to legislate only in respect to the currency of the United States and obligations solely payable in such currency. In all of the legislation there has been no attempt to deal with obligations payable abroad in a foreign currency. Where a statute is clear and unambiguous, the rule invariably applied by the courts is that the intention must be found from the language used. ( *People ex rel. Attorney-General* v. *Utica Ins. Co.*, 15 Johns. 358, 380, 394.) This is an old decision, but, so far as I know, its soundness has never been questioned or overruled. (See, also, *Osborne* v. *International R. Co.*, 226 N. Y. 421.)

Under the express terms of the coupons in question, they are not necessarily payable in money of the United States, and are, therefore, not within the contemplation of the Gold Clause Resolution. We must regard the coupons as though they had provided only for payment in guilders, as that was one of the options of the holder. The options were to demand payment in dollars in New York, in pounds sterling in England, or in guilders in Holland. No other construction of the coupons is possible, except as conferring such option upon the holder. Suppose the coupons had provided that the same should be discharged by the payment of 62.26 guilders when presented at Amsterdam, Holland. Could there be any question that the holder could present the same at Amsterdam and demand his guilders? The obligor company was not called upon to satisfy the coupon until it was presented. It could not determine the place of payment or the currency in which it would be paid. Those matters were entirely dependent upon the will of the holder of the coupons. The very bonds issued by defendant to which the coupons were attached, clearly show that it was the intent of the defendant to make payment optional with the holder of the bonds, either in the United States *or* at designated offices of the defendant in foreign countries. In this respect the bonds provided as follows: " Payment of the principal and interest of this bond will be made at the office or agency of the Company in the Borough of Manhattan, in said City of New York, in gold coin of the United States of America, * * * or at the option of the holder, at designated offices in said foreign cities and countries, respectively, at which it is expressed to be payable." The above provision follows immediately after the promise of the defendant, on the maturity of the bonds, to pay the bearer or registered holder in New York, $1,000, or in Amsterdam, Holland, 2,490 guilders, and to pay interest on said principal amount from May 1, 1912, in said respective currencies at the rate of five per cent. The purport of such contract was that said coupons, having been duly presented by the holder at the office or agency or the defendant in Amsterdam, Holland, must be read as follows: " On the First day of November, 1933, * * * Bethlehem Steel Company will pay to Bearer at its office or agency * * * in Amsterdam, Holland, Sixty-Two Guilders, Twenty-Five Cents, being six months' interest then due on its First Lien and Refunding Mortgage Five Per Cent. Thirty-Year Gold Bond, Series A, No. [Number of bond to which coupon was attached.] " When the coupons were presented at Amsterdam after their maturity, each thereof became an absolute obligation to pay to the holder 62 guilders 25 cents. The obligation was not " payable in money of the United States."

Unquestionably, had the plaintiff demanded payment of the coupons in New York, the defendant's obligation would have been within the scope of the resolution as an obligation "payable in money of the United States." The holder was free to exercise the option provided for in the contract, and to present and demand payment thereof in Amsterdam, Holland. It seems perfectly plain to me that where the contract here gave to the obligee the right to require payment by the obligor in either of three different places, in the currency mentioned in the coupon, when the option was exercised the contract must be read as though the obligor had contracted to do only that which was required by the obligee. The alternative obligations gave way to the one exercised by the obligee. A quite analogous situation arises with reference to power of appointment given by will or deed. The instrument in such case exercising the power must be read into that which creates the power " in like manner as if the power and the instrument which created it had been incorporated into one instrument." (*Chanler* v. *Kelsey*, 205 U. S. 466; *Matter of Stewart*, 131 N. Y. 274; *Matter of Harbeck*, 161 id. 211.) As is well stated in the brief of the respondent, the contract is no different than if it had been a contract of life insurance and had provided that in the event the assured died in Holland the insurance would be paid the beneficiary in guilders, but if such person died in the United States the payment to the beneficiary would be made in dollars. Under such a contract, if the person died in Holland, the obligation to pay guilders would become absolute, and the alternative provision providing for payment in dollars in case of death in the United States would necessarily be disregarded.

It seems to me that the payment in guilders was, in fact, a satisfaction of the coupons by the delivery of a commodity. The appellant in its brief recognized that the agreement to deliver Dutch guilders was an agreement to deliver commodities, citing *Hicks* v. *Guinness* (269 U. S. 71, 80). The same view has been adopted by this court (*Gross* v. *Mendel*, 171 App. Div. 237, 240; affd., 225 N. Y. 633). It seems to me the great difficulty in the appellant's position lies in the fact that the Gold Clause Resolution relates only to contracts " payable in money of the United States," or obligations which are, in fact, payable in money of the United States. Nowhere does the resolution refer to contracts conferring an option upon an obligee to require payment in money of the United States or in a foreign jurisdiction, or to obligations which would become payable in money of the United States if certain events should happen. The Congress did not attempt to legislate on any such hypothetical contracts. The only question here is whether the contract in

question created an obligation alone " payable in money of the United States."

The appellant makes no claim that the coupon itself is ambiguous. There is no contention made that it was not the purpose and intent of the defendant corporation to provide for payment of the bonds and coupons in guilders if presented at the office or agency of the defendant at Amsterdam, Holland. Unquestionably, at the time the bonds were issued the defendant thought that the dollar was more stable than sterling or guilders and that the inclusion of sterling and the guilder alternatives in the contract would not adversely affect the company. In this assumption the defendant was disappointed, but the disappointment of the defendant should not alter the construction or interpretation of the perfectly plain and unambiguous contract. If the contract had been that the coupons in question were to be payable, either in money of the United States or in sterling in England, or if, upon presentation of the coupons, in payment of each thereof the defendant would deliver to the holder a bushel of bulbs, of which Holland is the world's greatest producer, would there be any question that upon the maturity of the coupons the holder could present the same at Amsterdam, Holland, and demand the delivery to him of his bushel of bulbs? Certainly not, and even though at the time that demand for the bulbs was made the market price thereof was far in excess of what the plaintiff would be entitled to receive if his coupons were presented in the United States or in England. Under the plain and unambiguous terms of the contract of the defendant, I see no escape from the defendant's being required to meet its obligation and to pay the coupons in Holland guilders.

The order and the judgment entered thereon should be affirmed, with costs to the plaintiff, respondent, against the defendant, appellant.

Judgment and order modified by reducing the amount of the judgment as entered to the sum of $1,500, and as so modified affirmed, with costs of appeal to the appellant.