## ANGLO-CONTINENTALE TREUHAND, A. G., v. ST. LOUIS SOUTHWESTERN RY. CO.*

No. 174.

Circuit Court of Appeals, Second Circuit.

Jan. 13, 1936.

Pierce & Greer, of New York City (George L. Buland, F. C. Nicodemus, Jr., H. Brua Campbell, and Ben C. Dey, all of New York City, of counsel), for appellant.

Guggenheimer & Untermeyer, of New York City (Harry Hoffman, Eugene Untermeyer, and Milton E. Mermelstein, all of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an action in contract to recover upon interest coupons attached to negotiable bonds. The defendant railway on January 1, 1912, issued mortgage bonds payable on January 1, 1952, with semi-annual coupons attached, payable January and July, and reading as follows: "On the first day of               St. Louis Southwestern Railroad Company will pay to the bearer upon presentation and surrender of this coupon for cancellation at its office or agency in the Borough of Manhattan in the City of New York twenty-five dollars in United States gold coin, or in London, England, £5 2s 10½d sterling, or in Amsterdam, Holland, 62.25 guilders, or in Berlin, Germany, 105.05 marks, or in Paris, France, 129.50 francs, being six months' interest then due upon its First Terminal and Unified Mortgage Bonds." The principal of the bonds was payable in the same terms. After the Joint Resolution of Congress on June 5, 1933, section 1 (31 U.S.C.A. § 463), but before January 1, 1934, the plaintiff, a foreign corporation, bought thirty-six of these bonds, and sued in this action upon the coupons falling due on January 1st and July 1st, 1934, and January 1st, 1935. The defendant defaulted upon the coupon falling due on January 1, 1934, when the plaintiff presented it at the agency in Amsterdam where they had been formerly paid; and although the complaint does not allege the presentation of the two later coupons, no point is made as to that, and the case is to be decided upon the assumption that the defendant has defaulted on all three. The only question is whether the damages recoverable in dollars in this action are to be calculated at the gold par of the guilder, or at the rate of exchange prevailing in New York at the time of judgment. The defendant filed an answer, which the plaintiff moved to strike out and for summary judgment on the complaint. This the judge granted and the defendant appealed.

As has been seen, the coupons contained alternative promises; the holder might demand gold dollars, pounds, guilders, marks or francs at his choice. If he chose any of the foreign currencies he could not get gold; he must be content with whatever the money of the country might be on the due date; it might then be exchangeable for all sorts of things, gold, silver, copper, land, coffee; it might be "inconvertible," not exchangeable for anything at all. When for example France and Germany and England went off the gold standard the defendant was relieved pro tanto, as it will be if Holland should similarly go off; it is therefore of no significance that she happens not to

*Certiorari denied Henwood v. Anglo-Continental Treuhand A. G., 56 S. Ct. 675, 80 L. Ed. —.

have done so in 1934 and 1935. If this were not plain enough from the absence from the promise of any requirement to pay gold, the contrast between foreign currencies and "dollars in gold" would put it beyond doubt. It is not necessary for us to decide that the joint resolution does not cover any conceivable promises to pay foreign currencies. Perhaps it may. It is true that "a particular kind of coin or currency" means only United States coin or currency, and that "obligation" means an obligation "payable in money of the United States"; still it is a plausible, though to us not a persuasive, argument that "obligation" means the instrument itself and that the resolution therefore covers all instruments which contain a promise to pay money of the United States. That would put these bonds within the resolution as to the promise to pay dollars in gold, as of course they are, but it does not advance the defendant's case a whit as to the other promises. They are within the resolution only in case its terms cover them, which they do not. It only proscribes a "provision" which "purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured" by either. Since, as we have seen, the promise to pay guilders did not "purport * * * to require payment in gold," the resolution does not hit it.

The defendant answers that, regardless of the exact wording of the resolution, the policy of Congress is apparent and should be given full effect; it was to protect citizens from the consequences of our going off the gold standard, which would otherwise add impossible burdens to their undertakings. The changes in international exchange were just as crushing to those who had promised to pay in foreign money; Congress could not therefore have meant these to be borne, even though in its haste it did not think to mention them. Especially is this true in the case of bonds held by an American on June 5, 1933, when the resolution took effect; he at least should not be allowed to sell to an alien and realize at once what Congress meant to forbid his taking in detail. We should not indeed be disposed to accept this argument even if we accepted the premise, until we found some language in the resolution which could support it; but it is not necessary to press the verbal incompatibility, because, whatever may be said for rounding out the policy of relieving American debtors, Congress gave no evidence of a purpose to ease the blow wherever it might fall. Before Perry v. U. S., 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912, 95 A.L.R. 1335, it had usually been assumed that the measure of damages upon a promise to pay in gold was the premium on gold, and in the case of promises to pay foreign money in foreign countries, its cost in dollars is still the measure, for foreign money is a commodity like wheat or shoes, and lawful to buy unlike gold. When we went off the gold standard, we added that burden to many other undertakings than those to pay foreign money; that was the result whenever an American obligor could not procure his performance in the United States. If he must buy it with dollars abroad, he was handicapped precisely as the defendant is here. Certainly the resolution cannot by the utmost latitude be stretched so far as to relieve such obligors, and while it is impossible to know how many citizens were so affected, we should have no warrant for supposing that they were insignificant in number or importance. Equally we should have no warrant in supposing that when the obligation was to pay foreign money, it was any nearer to the putative purposes of Congress than if it was to do anything else.

So much for the relief of American debtors. In its impact upon alien obligees as well, if construed as the defendant wishes, the resolution would have results which we ought not to impute to Congress gratuitously. It may be too much to say that a statute would be void which should undertake to discharge a citizen from a contract with an alien to be performed abroad; conceivably if the alien had to seek the obligor here, the statute would protect him. Yet no court of the place of performance would pay the least attention to it, if the citizen or his property fell within its power; by the law of most civilized countries the legality of the performance of a contract depends upon the law of the place of performance, and a contract is enforceable, if lawful by the law of the place of making when made, and if the performance is lawful by the law of the place of performance when due. Certainly that is true of our own law. Restatement of Conflict of Laws, § 360. If the resolution had meant to prescribe otherwise, it would in substance have been an invasion of the prerogative of other states, and would be properly resented as

contrary to the implications of mutual comity; we are justified in insisting that a statute must make such an intent plain beyond any doubt. Nor can we say because the coupons at bar were owned by citizens on June 5, 1933, that the alien plaintiff who bought them thereafter was in a worse position than if it had bought them before. If the resolution did not reach bonds held by aliens when passed, it did not reach those then held by citizens; we cannot give the same words one meaning for one set of obligees and another for another. Congress either forbad the enforcement of such promises, or it did not. We will not try to recast it altogether, excepting alien obligees though its language covers them equally with citizens. There is a limit to the power of courts to mould the language of a statute in the interest of even the clearest immanent purpose; and we are not here certain of the existence of such a purpose.

Judge Lindley in McAdoo v. Southern Pac. Co. (D.C.) 10 F.Supp. 953, took our view; the Appellate Division of the Supreme Court of New York by a majority of four to one decided otherwise. City Bank Farmers Trust Company v. Bethlehem Steel Co., 244 App.Div. 634, 280 N.Y. S. 494. We are not persuaded by the reasoning of the majority.

Judgment affirmed.