ZURICH GENERAL ACCIDENT & LIABILITY INSURANCE COMPANY, LTD., Plaintiff, *v.* LACKAWANNA STEEL COMPANY, BETHLEHEM IRON MINES COMPANY and Another, Defendants.

Supreme Court, Special Term, New York County, October 20, 1937.

*Miller, Owen, Otis & Bailly* [*Redmond F. Kernan* and *James N. Hyde* of counsel], for the plaintiff.

*Cravath, de Gersdorff, Swaine & Wood* [*William D. Whitney* and *William W. Robison* of counsel], for the defendants.

ROSENMAN, J.   This is a motion for summary judgment by the holder of a large number of matured coupons appurtenant to bonds issued by the Lackawanna Steel Company, the payment of which has been assumed by the defendant Bethlehem Steel Company. The coupons provide that the obligor "will pay to the bearer at its office or agency in the City of New York, U. S. A., TWENTY-FIVE DOLLARS, United States Gold, or in London, England, £5.2.10–1/2 Sterling, or in Frankfort o/M., Germany, M. 105, or in Amsterdam, Holland, G1.62, or if paid in France, Belgium or Switzerland, Fcs. 129.50, being six months' interest then due on its FIRST CONSOLIDATED MORTGAGE GOLD BONDS SERIES A."

The plaintiff presented its coupons for payment in Switzerland and demanded payment in Swiss francs.   The defendant refused to meet the demand, and the plaintiff has brought this action to recover the dollar value of the Swiss francs which it claims should have been paid when these coupons were presented for payment.

The plaintiff's demand is for a sum substantially in excess of the number of United States dollars called for by the coupons, as a result of the devaluation of the American currency which took place in 1933 and 1934.   This premium the defendant has refused to pay.   The defendant is willing to pay the twenty-five dollars in present American currency, as called for in the coupons.   If the plaintiff prevails, instead of receiving twenty-five dollars for each coupon, it will receive a much greater amount.   The defendant's position is that the joint resolution of the Congress, dated June 5, 1933 (Public Resolution No. 10, 73d Congress; 48 U. S. Stat. at Large, 113; U. S. Code, tit. 31, § 463), permits it to discharge its obligation to its bondholders by payment, dollar for dollar, in

legal tender. The defendant also resists summary judgment on the further contention that the plaintiff purchased these coupons from American holders after June 5, 1933, for the sole purpose of evading the provisions of the joint resolution, on the theory that, although American citizens might be bound by the terms of the resolution, foreigners would not be so bound.

The plaintiff's contention is that the joint resolution does not cover these coupons in so far as they are payable in alternative currencies.

An analysis of the joint resolution will disclose that it relates to two independent subjects, both of which may or may not be included in any one particular instrument.

It relates to every " *obligation* " payable in money of the United States. It relates also to " *provisions* " in *any* obligation which give the obligee a right to demand payment in gold.

With respect to such " obligations," it provides that they shall be payable, dollar for dollar, in any legal tender. With respect to such " provisions," it provides that every one of them, past, present or future, shall be void as against public policy. And it further provides that every obligation is payable, dollar for dollar, in legal tender even though there be not included in the obligation such a provision to pay in gold.

In each of the coupons involved in this suit there is the " provision " about payment in gold. In each of them there is also an " obligation payable in money of the United States," but there is also contained in them a further provision about payments in alternative currencies. Therefore, both of these main subjects which are treated by the joint resolution are included in the one obligation, *i. e.*, the coupon.

The joint resolution says that the first provision is void as against public policy. The question presented here is whether the provision for payments in alternative currencies may be enforced. It may not be enforced if the joint resolution says it may not, for the joint resolution has been upheld as a valid exercise of the congressional power to regulate the currency of the United States. (*Norman* v. *Baltimore & O. R. R. Co.*, 294 U. S. 240.)

The joint resolution by its very terms covers " every obligation," which is defined as " every obligation payable in money of the United States." This language is broad enough to cover these coupons, even though they are alternatively payable in other currencies. If one alternative method of payment is proscribed by the statute expressly, the entire obligation is covered even though the other alternative may not itself be specifically banned. This is the rule which has been applied to situations where an

agreement is framed in the alternative and one of the alternatives is subject to the Statute of Frauds. The statute is deemed in such cases to include the entire obligation, so that both alternatives contained in the obligation are considered unenforcible. (*DeBeerski* v. *Paige*, 36 N. Y. 537.) The same principle should be applied to the analogous situation here under consideration.

The joint resolution, not stopping with the phrase which outlaws provisions in obligations calling for payment in gold, proceeds to make payment of legal tender sufficient for *all* obligations payable in money of the United States, whether they contain such a provision for gold payment or not. This latter provision, applicable to all such obligations, was not necessary if the joint resolution were only intended by the Congress to cover United States coin or currency, since the separate gold clause provision in the resolution took care of the question of United States coin and currency even if gold payments were promised. It must have been intended by the Congress to cover not only situations where gold had been promised, but also all cases where a promise has been made, like the present one, which would have required payment in some other manner than dollar for dollar on a parity with other obligations. An alternative currency provision is one of the contingencies at which the joint resolution was aimed.

The resolution was adopted by the Congress as one of a series of legislative and executive acts designed to meet the unprecedented economic and monetary crisis which had come upon the Nation. The general policy followed in these enactments was to devalue the dollar for the purposes of protecting the foreign commerce of the United States from other depreciated currencies, of maintaining the parity of currency issues of the United States, and of reducing the unjust burden of debts which, because of fallen prices, required payment in so many more units of commodities in 1933 than when the debts had been created. That was the policy expressed in the preamble of the joint resolution itself; it had been declared in the so-called Thomas Amendment to the Agricultural Adjustment Act (48 U. S. Stat. at Large, 51–53, § 43), which gave the President the right to devalue the dollar. The joint resolution had to be enacted to protect this policy, because so many billions of dollars of obligations issued in normal times were then outstanding which had contractual requirements inconsistent with this policy, such as payment in gold, or payment in currencies of other nations which had not gone off the gold standard. In the emergency it was clearly necessary to invalidate *all* provisions which were in conflict with this general policy; and that was the intention of the Congress when it acted.

The purpose of the resolution, as judicially stated by our highest court, was " to establish a uniform currency, and parity between kinds of currency, and to make that currency, dollar for dollar, legal tender for the payment of debts " ( *Norman* v. *Baltimore & O. R. R. Co.*, *supra*, p. 316). The court there held ineffectual a contractual provision for payment in gold, on the ground that it frustrated this policy of the Congress which was being carried out pursuant to its constitutional " broad and comprehensive national authority over the subjects of revenue, finance and currency " (p. 303). The statement in the opinion pointing out the " dislocation of the domestic economy " which would be caused by " a disparity of conditions " in which debtors on bonds would earn their income in a depreciated currency but would be obliged to disburse their interest payments in a currency of much higher value, is equally applicable to bonds payable in alternative currencies.

From a reading of the resolution in the light of the economic and financial conditions of the time of its adoption and in the light of the avowed policy of the Congress adopted to meet such conditions, I conclude that these coupons are covered by the resolution. That conclusion is in line with established appellate court precedent in this State.

In *City Bank Farmers Trust Co.* v. *Bethlehem Steel Company* (244 App. Div. 634) an American owner of bonds similar to those here in suit was denied payment of the undepreciated amount of currency, after presentation of his coupon in Amsterdam for payment in Dutch guilders. It is true that in the opinion of the court in that case significant mention was made of the fact that the plaintiff there was an American citizen, and not a foreigner as in the case now under consideration. The opinion in the Appellate Division, however, states (at p. 635): " We believe that the points made by the appellant [the obligor of the bond] are sound and that the judgment should be modified." I have examined the brief of the appellant in that case, and no distinction was made therein between American and foreign holders. The argument was directed principally to the point that " multiple currency " obligations are within the ban of the joint resolution. Although the opinion mentions the fact that the plaintiff was an American corporation, a reading of the entire opinion shows that that was not the basis of the decision. Nor does the joint resolution make any distinction in its terms between different classes either of obligors or obligees — American or foreign.

Even if the conclusions here reached are not correct, that the alternative payments provided for in these coupons are excused

by the resolution, the authority of the case of *Anglo-Continentale Treuhand, A. G.* v. *Southern Pacific Co.* (N. Y. L. J. Jan. 2, 1937, at p. 9; affd. without opinion, 251 App. Div. 803) would prevent a summary judgment for any amount in excess of twenty-five dollars for each coupon. For there is still present here, as there was in that case, " the issue of whether the transfer of the coupons to this plaintiff was *bona fide* or with intent to evade the effects of the joint resolution as interpreted by the Appellate Division," which can be determined only by trial.

It is not necessary to consider what effect, if any, the joint resolution would have if suit were brought in a foreign country. That question would involve the extra-territorial effect of the resolution on the contractual rights of citizens of another sovereignty. When the suit is brought in our courts, the will of the Congress should be upheld as to all plaintiffs, citizens or foreigners.

The fact that this defendant formerly announced a policy of paying undepreciated currency to *bona fide* foreign holders of its bonds, who had not purchased their bonds for the purpose of speculating after the devaluation of the American currency, does not prevent it from insisting now upon its legal rights under the joint resolution. Whether its present change of policy has come from a change in business judgment or from a realization of the fact that many American holders of its bonds have been selling their bonds or coupons to foreigners to evade the provisions of the resolution is immaterial.

Two decisions in the Federal courts are directly opposed to the result here arrived at: *McAdoo* v. *Southern Pacific Co.* (10 F. Supp. 953; revd. on other grounds, 82 F. [2d] 121; *Anglo-Continentale Treuhand A. G.* v. *St. Louis Southwestern R. Co.*, 81 id. 11; certiorari denied, 298 U. S. 655). Since their decision, however, a contrary ruling has been made by the Appellate Division in this Department in affirming without opinion the holding in *Anglo-Continentale Treuhand A. G.* v. *Southern Pacific Co.* (*supra*). The authority of our own appellate courts will in such circumstances take precedence, since the denial of certiorari by the highest court does not determine the merits of the appeal.

As to some of the coupons here sued upon, the defense of *res adjudicata* is raised. This defense is based upon a prior action between these same parties on coupons from some of these same bonds, in which the plaintiff was awarded summary judgment against the defendant under a judicial construction of the joint resolution different from the one here adopted. The defendant did not appeal from that judgment.

Since the result of this action will not destroy or impair the substance of the rights or interests established in the first action on the other coupons, the defendant may raise new issues even though they could have been interposed and litigated in the prior action (*Schuylkill Fuel Corp.* v. *Nieberg Realty Corp.*, 250 N. Y. 304). New defenses are here presented, such as the issue of good faith in the transfer of the coupons. Besides, the sole question on which the prior case was determined was one of law, and not of fact. The rule of *stare decisis* would accordingly be more appropriate than *res adjudicata*. However, in view of what I deem to be contrary holdings of the Appellate Division in this Department, and because I construe the statute differently, I am constrained not to follow the prior decision on the other coupons.

Judgment will be allowed only for the sum of twenty-five dollars per coupon. Settle order.