### GUARANTY TRUST CO. OF NEW YORK v. HENWOOD et al. (two cases). ※
Nos. 11172, 11182.

Circuit Court of Appeals, Eighth Circuit. July 13, 1938.

※ Writ of certiorari granted 59 S.Ct. 146, 83 L.Ed. ——.

Ralph M. Carson, of New York City, and Guy A. Thompson, of St. Louis, Mo. (Edwin S. S. Sunderland, of New York City, John M. Holmes, of St. Louis, Mo., and Malcolm Fooshee, of New York City, on the brief), for appellant.

A. H. Kiskaddon and Carleton S. Hadley, both of St. Louis, Mo., for appellee Berryman Henwood, trustee.

George L. Buland, of New York City (Ben C. Dey, of New York City, on the brief), for appellee Southern Pac. Co.

Harry Hoffman, of New York City (Wayne Ely and Lyon Anderson, both of St. Louis, Mo., on the brief), for Anglo-Continentale Treuhand, A. G., et al., amici curiæ.

William D. Whitney, of New York City (Cravath, de Gersdorff, Swaine & Wood, Le Boeuf, Machold & Lamb, Horace R. Lamb, and Robert D. Blasier, all of New York City, on the brief), for amici curiæ Cravath, de Gersdorff, Swaine and Wood, et al.

Before STONE, SANBORN, and VAN VALKENBURGH, Circuit Judges.

STONE, Circuit Judge.

As of January 1, 1912, the St. Louis Southwestern Railway Company (a Missouri corporation) executed a deed of trust (First Terminal and Unifying Mortgage) securing an issue of bonds. That company is now in administration under Section 77

of the Bankruptcy Act, as amended (11 U.S.C.A. § 205). Appellant, as trustee in the deed of trust, filed a claim for the bondholders asserting a right to payment[1] in Dutch guilders instead of dollars and for allowance of the claim in an amount of dollars equal to such·guilder value. Objections were filed to such payment and allowance—there being no objection to allowance on the basis of payment in dollars. From an order allowing the claim in dollar but denying it in guilder value, the trustee prosecutes an appeal allowed by this Court and also one allowed by the District Court.

The deed of trust provided ·both for coupon bonds and registered bonds. This claim of the trustee has to do only with coupon bonds. As to such, both the deed of trust and the bonds (including interest coupons) contained similar multiple currency provisions which were expressed as follows (taken from the bonds) : The company promises to pay "at its office or agency in the Borough of Manhattan, City and State of New York, One Thousand Dollars in gold coin of the United States of America, of or equal to the standard of weight and fineness as it existed January 1, 1912, or·in London, England, £205 15s 2d, or in Amsterdam, Holland, 2490 guilders, or in Berlin, Germany, marks 4200, D.R.W., or in Paris, France, 5180 francs". The definite amounts in the various foreign currencies set forth represent the exchange value of $1,000 in gold in each of those currencies as of the date January 1, 1912. The outstanding controversy in this court, as in the trial court, is whether these provisions of the deed of trust and of the bonds (including interest coupons) giving an option of payment in currencies other than American gold dollars is rendered nugatory by the Joint Resolution of Congress, approved June 5, 1933 (48 Stat. 112, 31 U.S.G.A. § 463).

This is a matter of the construction of the Joint Resolution. The particular language of the Resolution involved here is Section 1, 31 U.S.C.A. § 463, reading as follows:

"(a) Every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of ·the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. * * *

"(b) As used in this resolution [section], the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations."

The line of cleavage arises here because of two things springing from the above quoted statement in the deed of trust and the bonds giving an option to the bondholder to elect payment in United States gold coins of a given weight and fineness or in any of the named foreign currencies. The first of these things is that this provision gives a clear right to payment in gold dollars. The second is that it does not require payment in such dollars only. That is, the obligation *may be* but need *not necessarily be* paid in gold dollars. For reasons to be stated, appellant contends that the Resolution covered only such obligations as *must* be paid in gold dollars or the equivalent measurement of other United States currencies. Appellees contend that the Resolution covers obligations which *may* be so paid.

Appellant bases its construction both upon existing judicial construction[2] of the Resolution and upon its own independent

---

[1] The use of the word "payment" is not accurate in the sense of actual receipt of payment. All parties recognize that there will be no actual payment of these bonds in connection with this Debtor proceeding. The purpose in demanding payment in guilders is to increase the dollar allowance of the claim above the par dollar value of the bonds and interest coupons.

Such would be the effect. The advantage would flow from the increased amount of this class of indebtedness in working out any plan of reorganization.

[2] Chief reliance is placed upon Anglo-Continentale Treuhand A. G. v. St. Louis Southwestern Railway Co., 2 Cir., 81 F. 2d 11, 105 A.L.R. 636, certiorari denied Henwood v. Anglo-Continentale Treu-

construction. First, as to judicial construction. Appellant relies mainly upon Anglo-Continentale Treuhand A. G. v. St. Louis Southwestern Railway Co., 2 Cir., 81 F.2d 11, 105 A.L.R. 636, and McAdoo v. Southern Pac. Co., D.C. N.D. Cal., 10 F.Supp. 953. Each of those cases decided that the Resolution did not cover multiple currency provisions, such as here—the former case involving bonds of the same issue as before us. The argument of appellant that the denial of certiorari by the Supreme Court in the former case should be given weight in the construction of the statute cannot be allowed. Atlantic Coast Line Railroad Co. v. Powe, 283 U.S. 401, 403, 51 S.Ct. 498, 75 L.Ed. 1142; United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361. Both the Anglo-Continentale and the McAdoo opinions reveal the same reasoning in reaching a decision. That reasoning is that the language of the Resolution is clear and unambiguous and means obligations which must be paid in United States gold dollars or the equivalent thereof in other United States money.

■ We are fully conscious of the fine ability of the Judges who wrote and concurred in the opinions urged by appellant; and we are sensitive to the desirability of harmony in the decisions of the various Circuits. However, we are not permitted thus to relieve ourselves of the duty of examining and determining for ourselves the issues coming before us. Where we have serious doubt or the determination is close, we are inclined to give solid weight to the consideration of harmony in decision. In this instance, we are unable to conclude that the Resolution is, as to the matter here, unambiguous. The crucial word "payable" is, standing alone, not confinable to one single definite meaning.[3] Nor is there such single meaning in a legal sense (48 C.J. 574). The meaning of the word can only be determined in the light of the situation and circumstances of its use. Our definition must be sought in the context of the Resolution and, if that does not clearly determine the matter, in such aids to construction as are permissible.

■ Turning first to the Resolution itself. We are unable to find in any part of the Resolution anything which expressly determines this construction—that is, there is no expression, on one hand stating that the obligation *must* be payable *only* in United States gold or United States money, or, on the other hand, that payment in multiple currencies, including United States gold, is included. There are particular expressions in the Resolution—such as "a right to require payment in gold or a particular kind of coin or currency [of the United States] or in an amount in money of the United States measured thereby" and "provision * * * which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby"—which are pertinent to our inquiry but each of them is, in itself, consistent with either of the opposed constructions here urged. In this situation, the Resolution is, therefore, not clear and hence is ambiguous.

When we take the Resolution as a whole we find, in its contents and wording, no further aid. We find ourselves in somewhat the situation presented in Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 57 S.Ct. 485, 81 L.Ed. 678, which involved another form of alternative payment and where the Court was driven to determine construction and application of this Resolution by resort to considerations of "the evil to be remedied" (pages 338, 339, 57 S.Ct. pages 488, 489)

hand A. G., 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1381, and McAdoo v. Southern Pac. Co., D.C.N.D.Cal., 10 F.Supp. 953. Also, appellant cites City Bank Farmers Trust Co. v. Bethlehem Steel Co., 244 App.Div. 634, 280 N.Y.S. 494; Anglo-Continentale Treuhand, A. G. v. Southern Pacific Co., 165 Misc. 562, 299 N.Y.S. 859, affirmed 251 App.Div. 803, 298 N.Y.S. 181; Anglo-Continentale Treuhand A. G. v. Bethlehem Steel Co., N.Y.L.J. Oct. 15, 1937; Nederlandsche Middenstandsbank N. Y. v. Bethlehem Steel Co., N.Y. L.J., June 13, 1936, and Zurich General Accident & Liability Ins. Co., Ltd. v. Lackawanna Steel Co., 164 Misc. 498, 299 N.Y.S. 862.

[3] For example, Webster's New International Dictionary (1931 Ed.) defines "payable" as

"1. That may, can, or should be paid; justly due.

"2. Law. a That may be discharged or settled by delivery of value. b That is to be paid (by any particular person); as, bills payable; also, matured or maturing; due.

"3. Likely or able to yield a profit; profitable; as, payable wash dirt; a payable commercial undertaking."

and whether the particular contract provision involved there was within the evil. In such a status, we must conclude that the expressions in the Resolution, critical here, are ambiguous. So believing, the reasoning (of the cited cases), based upon the view that the Resolution is unambiguous, cannot be followed by us.

As to construction independent of the persuasive authority of the above decisions, appellant urges the following: (1) the first sentence of paragraph (a) of the section declares only "gold clauses" to be against public policy and nothing else is invalidated —no attempt to nullify foreign money alternatives can be found in the Resolution; (2) the words "obligation" and "payable", as used in the Resolution, mean "the absolute legal obligation or duty to pay in dollars"; (3) the sole purpose of the Resolution was to nullify "gold clauses" and there was no intention to affect obligations payable in foreign currencies; (4) the guilder alternative is of equal rank with the dollar alternative and is not equivalent to a promise to pay gold or money of the United States measured by gold.

We shall not treat each of the above four contentions separately but will include the substance of them in one discussion. Regarding ambiguity as existent in the Resolution and since the ambiguous portions are consistent with either of the here opposed contentions, we are pointed a proper method of solution in the Holyoke Water Power Company Case, supra. That method is consideration of the evil intended to be prevented by the Resolution and the relation to that evil of the provisions for payment in multiple currencies here involved. The great purpose of the Resolution was expressed in the title: "To assure uniform value to the coins and currencies of the United States." The Chief Justice has expressed the purpose as an undertaking "to establish a uniform currency, and parity between kinds of currency, and to make that currency, dollar for dollar, legal tender for the payment of debts." Norman v. Baltimore & O. R. Co., 294 U.S. 240, 316, 55 S.Ct. 407, 419, 79 L.Ed. 885, 95 A.L.R. 1352. Justice Cardozo has concisely stated the same as "the maintenance of our monetary system." Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 340, 57 S.Ct. 485, 490, 81 L.Ed. 678. The Preamble of the Resolution further declared

the purpose as being "to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts." 48 Stat. 112.

The Preamble further declared that such purpose was obstructed by existing contracts containing provisions "which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby." To remove such obstruction, such provisions were nullified to the extent that they went beyond the requirement of payment "dollar for dollar, in any coin or currency [of the United States] which at the time of payment is legal tender for public and private debts." Section 1 (a). In short, the evil struck at by the Resolution was contract provisions purporting "to give the obligee a right to require payment in gold or a particular kind of coin or currency [of the United States] or in an amount in money of the United States measured thereby"— as defined in paragraph (b), "payable in money of the United States." 31 U.S.C.A. § 463. The reason why this is an evil and the reason for preventing it being to prevent obstruction of the maintenance of the equal value of the various United States monies "in the markets and in the payment of debts."

With the evil and the reason for prevention in mind, we examine the provisions of the instruments before us to ascertain whether they fall within or without that evil and that reason as so expressed. The provision in the bonds (typical of those in the deed of trust and in the interest coupons) is that the obligor promises to pay "at its office or agency in the Borough of Manhattan, City and State of New York, One Thousand Dollars in gold coin of the United States of America, of or equal to the standard of weight and fineness as it existed January 1, 1912, or in London, England, £205 15s 2d, or in Amsterdam, Holland, 2490 guilders, or in Berlin, Germany, marks 4200, D.R.W., or in Paris, France, 5180 francs."

That portion of the provision reading payment "at its office or agency in the Borough of Manhattan, City and State of New York, One Thousand Dollars in gold coin of the United States of America, of

or equal to the standard of weight and fineness as it existed January 1, 1912" clearly is a provision "which purports to give the obligee a right to require payment in gold" and in "a particular kind of coin"—the weight and fineness being specified—of the United States.

The amount of guilders, pounds, francs or marks which might be elected by the obligee was, admittedly, determined by the value of the gold dollar as of January 1, 1912. The only effect of stating the precise amounts in those foreign currencies was to make definite and certain what might have been expressed as "guilders, pounds, francs or marks which would be the equivalent of their values on January 1, 1912, as measured by the value of one thousand gold dollars of the weight and fineness as of that date."

In this situation, what can normally take place and what is, in fact, here desired by appellant and will take place if the view of appellant be accepted is as follows: one class of creditors of a domestic corporation doing a purely domestic business will, in a United States court of bankruptcy and in a reorganization proceeding, secure a decided advantage not warranted by the dollar value of their obligations as controlled by the Resolution[4] ; and such advantage will be secured purely by a calculation of the value in United States dollars of a foreign money—such value being brought about by the provisions of an obligation fixing the amount of such foreign money based on the value of the gold dollar of a specified weight and fineness.

The provision may or may not have had an entirely proper business purpose of making the bonds attractive to investors in Holland, England, France and Germany by providing for payment in the money of such countries within those countries. But it is the effect and not the purpose which is important. The effect is to freeze the unit of payment as of the gold dollar of the weight and fineness of January 1, 1912. The provision afforded a facile method by which every bond and interest coupon of the indebtedness—whether owned abroad or in this country—could be easily converted into payment in domestic gold dollars of a given weight and fineness or the foreign money (measured thereby) most advantageous to the holder at the time of payment. Since the face amount of the obligations is calculated in terms of the gold dollar at a specific date, the real effect is to give an option of payment in the most advantageous money (foreign or domestic) which, at the time of payment, nearest approaches the specified gold dollar value. By the simple expedient of immediately purchasing "dollars" after securing payment in guilders, pounds, marks or francs, the holder acquires, within the United States, a substantial premium over what could have been realized by receipt of payment in the United States. Hence, the holder is secured from depreciation of the gold dollar not only by a gold clause provision but by a four-fold further assurance in these foreign currencies of values based on the specified gold dollar. Thus by running around an international stump —passing though Holland en route—the holder of every bond and coupon enriches himself substantially at the expense of the debtor and of other creditors. Here, the same result (with further saving of exchange charges) is reached merely through a formal demand in Holland for payment (known to be futile) and by a simple mathematical calculation. Also, this in a situation where no payment is possible but where the above advantage will increase the indebtedness of the debtor and, therethrough, the participation of these holders in the property reorganization at the expense of every other person financially interested in that property.

Such a result would be squarely within a situation similar to that expressed by the Chief Justice in outlining the effect of

---

[4] The allowance here covered 5636 bonds of one thousand dollars each. Exclusive of interest, the allowance on principal was $5,636,000. The amount which would have been allowed had the guilder option been enforced as asked would have been $9,512,001.19. The difference—$3,876,001.19—arises from the difference in dollar value of the guilder in 1912 and at the dates of payment claimed by appellant to be here involved. In 1912, the dollar value of the guilder was $.4020; at the dates here claimed to be involved, such value was $.680567. The lowest dollar value of the guilder in this record at any date subsequent to the filing of this debtor proceeding is $.5560. The advantage thus obtainable, if appellant should prevail, would be a gain over face dollar value of these bonds of $3,876,001.19 or slightly over $2,158,588.00 dependent on whether the guilder is valued at $.680567 or at $.5560.

devaluation of the dollar. Norman v. Baltimore & O. R. Co., 294 U.S. 240, 315, 55 S.Ct. 407, 419, 79 L.Ed. 885, 95 A.L.R. 1352. Clearly, such result so reached would interfere with the purpose of the Joint Resolution (expressed in its title) "To assure uniform value to the coins and currencies of the United States" which was to be accomplished through enforcement of "the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts" by striking down all private obligations requiring payment in a particular kind of coin or currency. In short, the evil sought to be avoided by the Resolution is accomplished by a form of indirection and, to that extent, the purposes of the Resolution and, therefore, the Resolution itself defeated. We think such a result brings these instruments within the intendment of the Resolution and within the ambiguous expressions, set out hereinabove, of the Resolution. The vice of these instruments, in the view of the Resolution, is that they provide for payment in gold dollars of a specified weight and fineness or, optionally with the holders, in foreign currencies, the amount or value of which is based upon that gold dollar.

In what has been stated above, we have had in mind the situation before us. Whether a contract arising out of transactions between citizens and foreigners— such, for example, as purchase of foreign goods by citizens—wherein payment was provided at foreign cities in foreign currencies, even if such currencies were measured by defined gold dollars, is without our present consideration. Also, we have not considered contracts involving satisfaction in gold as a commodity. While foreign currencies are, if within this country, "commodities" in the sense that they have no standing as mediums of exchange, yet the contract provisions here provide for "payment" in money only and in foreign monies only within foreign countries. These contracts are money and not commodity contracts.

The order appealed from should be and is

Affirmed.

*Rehearing granted Aug. 29, 1938.