## HOLYOKE WATER POWER CO. v. AMERICAN WRITING PAPER CO., Inc.

### No. 5932.

District Court, D. Massachusetts.

Jan. 2, 1935.

See, also (D. C.) 8 F.Supp. 656.

Bentley W. Warren, Howard Stockton, Jr., and Warren, Garfield, Whiteside & Lamson, all of Boston, Mass., for plaintiff.

Charles P. Curtis, Jr., Choate, Hall & Stewart, and John L. Hall, all of Boston, Mass., for defendant.

Russell L. Davenport and O'Connor & O'Connor, all of Holyoke, Mass., for Park Nat. Bank.

McLELLAN, District Judge.

The plaintiff seeks to recover rentals payable January 2, 1934, at Holyoke, Mass., under seventeen indentures for the lease of mill powers. A single indenture concededly may be taken for practical purposes as typical of all. The semiannual rental payable under one of these indentures is stated to be "a quantity of gold equal in amount to $1,-500.00 of the gold coin of the United States of the standard of weight and fineness of the year 1894, or the equivalent of this commodity in currency."

The defendant contends that its obligation amounted to $1,500, and if this contention is sound, the amount payable under all the indentures was $22,975, less a deduction of $2,087.14 for deprivation of water, or $20,887.86. It is urged that this amount can be reached in either of two ways. It is attainable by adding together the number of dollars mentioned in the various indentures and making the requisite deduction. The same result follows from computing the quantity of gold in the number of dollars at $20.67 an ounce and deducting $2,087.14 for deprivation of water.

According to the plaintiff, the defendant's obligation amounted to $32,034.24. This amount is attainable, after a correspondingly larger deduction than claimed by the defendant for deprivation of water, by valuing gold at $32.57 per ounce, at which price the plaintiff says it should be valued for reasons hereinafter appearing.

There was evidence of a restricted market in New York for gold at about $27 an ounce. For reasons which need not be dis-

cussed, sales in that market furnish no criterion for the assessment of damages. Neither party argues that they do.

The defendant was obligated in the sum of $20,887.86 if.

(a) The obligation was to pay the number of dollars mentioned in the instruments, or

(b) No such obligation existed, and gold was worth only $20.67 an ounce.

The damages amounted to $32,034.24, if the plaintiff's theory as to damages, hereinafter stated, is correct.

The nature of the contracts so far as pertinent to these questions and the acts of Congress and Executive Order affecting them should be considered at the outset.

The Joint Resolution of Congress of June 5, 1933 (section 1 [31 USCA § 463]), reads in part:

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. * * *

"(b) As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; * * *"

Under date of August 28, 1933, an Executive Order (No. 6260 [12 USCA § 95 note]) was issued by the President in accordance with the Act of March 9, 1933 (section 2 [12 USCA § 95a]), which prescribed the conditions upon which gold coin and gold bullion could be obtained or held. On December 28, 1933, the Secretary of the Treasury, pursuant to the Act of March 9, 1933, "required every person subject to the jurisdiction of the United States forthwith to pay and deliver to the Treasurer of the United States all gold coin, gold bullion and gold certificates situated in the United States owned by such person," with certain exceptions not here pertinent. This order of December 28, 1933, also provided that "the Secretary of the Treasury will pay for the gold coin, gold bullion and gold certificates (delivered) an equivalent amount of any form of coin or currency coined or issued under the laws of the United States, designated by the Secretary of the Treasury." Under date of January 15, 1934, an order by the Secretary of the Treasury fixed January 17, 1934, as the last day for the delivery of gold under his former order, and under date of January 17, he prescribed that there should be paid for gold delivered thereafter "for such gold coin and gold certificates the dollar face amount therefor, and for gold bullion $20.67 an ounce."

■ The typical indenture purports to permit the defendant to satisfy it

(a) In a quantity of gold equal in amount to $1,500 of the gold coin of the United States of the standard of weight and fineness of the year 1894; or

(b) The equivalent of this commodity in United States currency.

The defendant had the option to do either of these things, unless in some way it was lost. If, as some authorities indicate may sometimes occur, the option had passed to the plaintiff, it has been exercised in favor of the second alternative by reason of the nature of the accounts rendered and the nature of this action. But it seems to me that before the defendant's right to elect between the two alternatives could have passed to the plaintiff, it had expired. The statute and executive orders, irrespective of their constitutionality, rendered the delivery of gold practically impossible, and the first alternative was terminated by impossibility of performance. There remained the obligation to pay "the equivalent of this commodity (gold) in currency." See Drake v. White, 117 Mass. 10.

■ I have been asked by the plaintiff to rule that Public Resolution No. 10 of the Seventy-Third Congress, as approved by the President on June 5, 1933, has no application to the case at bar, and by the defendant, to rule that the obligations of the defendant "are covered by" this resolution. My views as to the pertinence of this legislation to the issue here presented should therefore be stated. By its terms it applies only to obligations payable in the money of the United States. At the outset the indentures here considered did not constitute obligations for the payment of money. The

rentals therein reserved were payable in the alternative. The covenants could be performed without the payment of money. See Holyoke Water Power Company v. American Writing Paper Company, Inc. (C. C. A.) 68 F.(2d) 261. But as heretofore stated, the right of the defendant to deliver gold as a commodity was ended by impossibility, and the obligation to pay its equivalent in currency survived. Though some portions of the debates preceding the passing of the resolution may indicate that it was intended to apply only to interest bearing obligations, its language seems to me clearly applicable to covenants to pay the equivalent of a commodity in currency. That portion of the resolution declaring that an obligation, which purports to give the obligee a right to require payment in an amount of money of the United States measured by gold, is against public policy, applies to an obligation to pay the equivalent of gold in currency. There is, however, nothing illegal about pre-existing contracts containing such a provision, and it was the intent of Congress to invalidate such contracts thereafter made and to prohibit their making. In this respect, and perhaps in other respects, the resolution applies to contracts of the nature here considered.

■ The defendant, however, insists and has requested me to rule that the defendant's obligations could have been discharged by payment "dollar for dollar of the amounts mentioned" in the indentures. The indentures contain no covenant to pay any definite sum of money. The number of dollars mentioned was the means of determining the amount of gold to be delivered or the amount of gold the equivalent whereof was to be paid in currency. The result which the defendant seeks cannot be reached in this way, without doing violence to the intention of the parties as expressed in their contracts.

■ In the typical indenture the defendant undertook to pay the equivalent of the amount of gold in $1,500 of gold coin. The plaintiff's damages are to be measured in this way, and the question for determination is the value of gold in Holyoke, Mass., where, and on January 2, 1934, when the rental was payable.

The plaintiff's position, as I understand it, is that there was no available free and open market for gold in the United States on January 2, 1934, and that the damages which it is entitled to recover are to be based upon the market value of gold in London, which, according to its contention, was the nearest available market. As affected, in part, by impossibility of performance, all that remained of the instant contract was a promise, not to deliver gold as a commodity, but to pay its value in currency. The plaintiff cites in support of this contention the following cases: Grand Tower Min. Mfg. & Transp. Company v. Phillips, 23 Wall. 471, 23 L. Ed. 71; Setton v. Eberle-Albrecht Flour Company (C. C. A.) 258 F. 905; Moss v. Sherburne (C. C. A.) 11 F.(2d) 579; and Glaspy v. Cabot, 135 Mass. 435. These authorities support the general principle that the measure of damages for breach of contract to deliver a commodity is the difference between the contract price and the market price at the time when and place where it should have been delivered. The foregoing authorities also show that in the absence of an available market for the goods there, the value at the place of delivery may ordinarily be shown by evidence of the market price at the nearest available place, with proper adjustments for the cost of transportation and insurance. See, also, National Coal Tar Company v. Gaslight Company, 189 Mass. 234, 75 N. E. 625; South Gardiner Lumber Company v. Bradstreet, 97 Me. 165, 53 A. 1110. As stated in Cahen v. Platt, 69 N. Y. 348, at page 352, 25 Am. Rep. 203:

"So it may not always be practicable to show the price at the precise place of delivery. There may have been no sales of the commodity there, and hence evidence of the price at places not distant, or in other controlling markets may be given, not for the purpose of establishing a market price at any other place, but for the purpose of showing the market price at the place of delivery."

When the reason for the rule admitting evidence of sales at other places than that at which delivery was to be made is considered, it becomes apparent that the rule has no application to a contract for the delivery of gold in Massachusetts on January 2, 1934. Sales tending to establish the market price of gold in London have no tendency to show the value of gold at the place mentioned in the instant obligations. No purchaser there could have brought it here as of right, and if he could have imported it, the gold would have been subject to requisition under the executive orders theretofore issued. If the defendant, by the terms of its contract, had promised to deliver gold and had broken that promise, the circumstances here were such that no London transactions could be of assistance in arriving at the amount of damages flowing from a breach of such a con-

tract. Nor can they be used to determine the amount of damages flowing from the defendant's breach of its obligation to pay in currency the equivalent of a certain quantity of gold.

The burden of proof is upon the plaintiff to establish its damages, and the only relevant evidence submitted as to the market price of gold was the price obtainable from the government on January 2, 1934, when by implication the price was fixed at $20.67 an ounce, or on January 17, 1934, when the price was expressly so determined by executive order. On this basis the plaintiff was entitled to receive in currency at Holyoke, Mass., on January 2, 1934, the sum of $20,-887.86.

Before the trial of this case upon the merits, the defendant had filed a special plea in bar, and had taken the position that it had made such a tender of this amount as constituted a discharge of the cause of action. For reasons which need not be repeated, this plea in bar, so called, was overruled without prejudice to the defendant's motion to amend its answer by setting up this defense. A tender does not constitute a discharge of a cause of action. There are circumstances under which a tender, followed by the payment of the amount tendered in court, so that the plaintiff, irrespective of the result of the litigation, is entitled to take it, may constitute such a discharge. Here there was no payment of any money into court and no discharge of the cause of action.

The question remains as to the effect of the alleged tender upon the matter of costs and interest. The tender was neither valid in the beginning, nor, if valid, was it kept good in such a way as to deprive the plaintiff of interest and costs. The defendant, on January 2, 1934, wrote the plaintiff, inclosing checks aggregating the above amount and stating that they were sent "in full payment of the installments of * * * mill power rentals due January 1, 1934." The plaintiff declined to accept the checks and returned them on the day on which they were received. The plaintiff waived its right to complain that checks instead of legal tender were sent, but it has not waived anything with reference to the conditional character of the "tender." The defendant did nothing more with reference to its so called tender until the beginning of the trial, when its counsel exhibited the checks.

The records of this court show, and it is conceded, that at the time of the trial, the defendant had presented to the court a petition for relief under the provisions of section 77B of the Bankruptcy Act (11 USCA § 207), and an order having been entered permitting its filing, the petition was duly filed. Prior to the trial, an order had been entered continuing the defendant in possession and control of its property and business, the effect of which order was practically the same as if trustees had been appointed. Other proceedings under section 77B of the Bankruptcy Act occurred prior to the trial. Had the checks been accepted by the plaintiff when exhibited in court, the drawee would not have been authorized to pay them, as was virtually conceded by defendant's counsel.

While the tender was of no avail, the effect of the proceedings under the Bankruptcy Act was to prevent the accrual of interest beyond that date.

Let judgment be entered for the plaintiff in the sum of $20,887.86, with costs and with interest to June 25, 1934, when the defendant's petition for relief under section 77B of the Bankruptcy Act was filed.