## HOLYOKE WATER POWER CO. *v.* AMERICAN WRITING PAPER CO.

No. 180. Argued December 11, 1936.—Decided March 1, 1937.

*Mr. Bentley Wirt Warren,* with whom *Messrs. Nathan P. Avery, James M. Healy,* and *Donald C. Starr* were on the brief, for petitioner.

326

328

*Mr. Charles P. Curtis, Jr.,* with whom *Messrs. John L. Hall, Claude R. Branch,* and *Russell L. Davenport* were on the brief, for respondent.

330

*Solicitor General Reed,* with whom *Attorney General Cummings* and *Messrs. Paul A. Freund, Herman Oliphant, Clarence V. Opper, Bernard Bernstein,* and

*Charles W. Boand* were on the brief, for the United States, as *amicus curiae,* by special leave of Court.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The controversy is one as to the number of dollars in present currency that will discharge a covenant for rent in leases antedating the reduction of the gold content of the dollar, the covenant being phrased in the manner hereinafter stated.

At various times between 1881 and 1897 thirteen leases were executed by the Holyoke Water Company, the petitioner, to the American Writing Paper Company, Inc., the respondent, for the enjoyment in perpetuity of water-power rights and privileges in consideration of an annual rental. With variations immaterial for present purposes, the provision for rental is the same in all the leases. By concession the following form has been accepted as typical: the grantee shall yield and pay unto the grantor as rent "a quantity of gold which shall be equal in amount to fifteen hundred ($1500) dollars of the gold coin of the United States of the standard of weight and fineness of the year 1894, or the equivalent of this commodity in United States currency." In 1894 and continuously thereafter till January 31, 1934, the statutory gold content of the dollar was twenty five and eight tenths grains of gold, nine tenths fine. Since January 31, 1934, by force of the Gold Reserve Act of that year (48 Stat. 337) and the order of the President thereunder, the gold content of the dollar has been fixed to consist of fifteen and five twenty-firsts grains of gold, nine tenths fine. Before that reduction a Joint Resolution of the Congress, dated June 5, 1933 (48 Stat. 112), had declared that every obligation payable in money of the United States, whether theretofore or thereafter incurred, should be discharged upon payment, dollar for

dollar, in any coin or currency which at the time of payment was legal tender for public or private debts, irrespective of any provision contained therein whereby the obligee was given a right to require payment in gold or in a particular kind of coin or currency, or in an amount in money of the United States measured thereby. The precise terms of the Resolution and its recitals will be considered more at length hereafter.

In June, 1934, the dollar having been then devalued, the lessee corporation became insolvent or unable to pay its debts as they matured. Taking advantage of § 77B of the Bankruptcy Act, it filed a petition for reorganization which the Court of Bankruptcy approved. The lessor (petitioner here) intervened in that proceeding and prayed that the amount due to it for rent under the several water-power leases be inquired into and determined. On behalf of the lessee the contention was that by force of the Joint Resolution the debt was dischargeable, dollar for dollar, in the then prevailing currency. On behalf of the lessor the contention was that the market price of fine gold at the time of the default and later was $35 an ounce, or $31.50 for an ounce nine tenths fine, and that payment should be made upon that basis for as many ounces of such gold as were contained in the stipulated dollars at the execution of the leases. In pressing that contention, the lessor did not deny that the law declines to give effect to contracts whereby debts are made payable in gold coin, or in currency varying in amount with the gold basis of the dollar. *Norman* v. *Baltimore & Ohio R. Co.,* 294 U. S. 240. What was argued was rather this, that the covenant here in question was not for the payment of a debt, but for the sale of a commodity, or if viewed as a covenant for payment, that the standard was the commodity value of the bullion, not the value of the coin as money, the difference being thought to be sufficient to change the applicable rule.

The District Court held in favor of the lessee, and computed the indebtedness accordingly. 11 F. Supp. 518; see 9 F. Supp. 451. The Court of Appeals for the First Circuit affirmed. 83 F. (2d) 398. Because of the importance of the question we granted certiorari.

1. The obligation was one for the payment of money, and not for the delivery of gold as upon the sale of a commodity.

The lessor was a water power company, engaged in that business and not in any other. There is no pretense that it was stipulating for gold to be used in art or industry. What it wished was currency, or bullion susceptible of being converted into currency, the lessee to make the choice. The alternative forms of payment shed light upon each other. They will be considered in succession.

By the first term of the alternative, there may be payment of the rent in the form of "a quantity of gold which shall be equal in amount to $1500 of the gold coin of the United States of the standard of weight and fineness of the year 1894." In this form there is no call for a stated number of ounces of fine gold, as if a goldsmith were providing for the uses of his business. The call is for gold that shall be as heavy and as fine as a stated number of gold dollars, with the result that delivery in such dollars is a payment in strict accordance with the letter of the contract. We must consider the situation of the parties, their business needs and expectations, in gauging their intention. When these are kept in view, the gold is seen to be a standard with which to stabilize the value of the dollar; the dollar not a yardstick with which to measure the quantity of the gold. To read the leases otherwise is to permit the realities of the transaction, its substance and essential purpose, to be obscured by forms and phrases. Long ago it was said by a distinguished member of this court, commenting upon a different statute, but one analogous in purpose: "If the contract

is for the delivery of a chattel or a specific commodity or substance, the law does not apply. If it is *bona fide* for so many carats of diamonds or so many ounces of gold as bullion, the specific contract must be performed [assuming, of course, that contracts for the delivery of bullion are not prohibited by law]. But if terms which naturally import such a contract are used by way of evasion, and money only is intended, the law reaches the case." Per Bradley, J., in *Legal Tender Cases,* 12 Wall. 457, 566. Here what was intended was to assure the payment of a money debt in dollars of a value as constant as that of gold. *Norman* v. *Baltimore & Ohio R. Co., supra,* p. 302; cf. *Feist* v. *Société Intercommunale Belge D'Electricité,* L. R. [1934] A. C. 161, 172, 173. The fact is of little moment that currency is characterized as a commodity in the verbiage of the covenant as long as it is currency. Cf. *Lipke* v. *Lederer,* 259 U. S. 557, 561, 562. Weasel words will not avail to defeat the triumph of intention when once the words are read in the setting of the whole transaction. So read, the end to be achieved is shown forth unmistakably as a payment, not a sale.

This conclusion would be necessary though the first of the alternative forms of payment stood alone in the indentures. The necessity becomes even plainer when the first is considered in conjunction with the second. The lessee at its option may pay the equivalent of the gold "in United States currency." The presence of this alternative gives a quietus to the argument that the lessor was desirous of the gold as a commodity and was bargaining therefor. If there had been any such desire, the choice as to the forms of payment would never have been left to the lessee, as by implication of law it was, for a debtor, if methods of performance are alternative, may choose whichever one he pleases. 3 Williston, Contracts, § 1407; Restatement, Contracts, vol. 1, p. 493. In point of fact, there were statutes in existence

at the time of the default in payment that made delivery of gold impossible. *Norman* v. *Baltimore & Ohio R. Co., supra,* pp. 295, 296; *Nortz* v. *United States,* 294 U. S. 317, 327, 328; *Perry* v. *United States,* 294 U. S. 330, 355. The lessee would perforce have had to avail itself of the second term of the alternative, if it had been able to pay at all. But if both modes of payment had been preserved, the second equally with the first would have been effective to discharge the obligation. Payment in currency, quite as much as payment in coin or in bullion, was not only performance under the law, but performance under the contract, provided only that the value of the currency was equal, when paid, to the value of the gold. Whether that proviso has been abrogated is next to be considered.

2. A contract for the payment of gold as the equivalent of money, and *a fortiori* a contract for the payment of money measurable in gold, is within the letter of the Joint Resolution of June 5, 1933, and equally within its spirit.

The Resolution, for convenience of reference, is printed in the margin.* Its history has been traced in *Norman*

---

* "JOINT RESOLUTION.

"To assure uniform value to the coins and currencies of the United States.

"Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

"Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) every pro-

v. *Baltimore & Ohio R. Co., supra.* There is no need to repeat what has been already done so thoroughly. The Resolution touches gold as well as coin or currency whenever transactions in either are within the evil to

vision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

"(b) As used in this resolution, the term 'Obligation' means an obligation (including every obligation of and to the United States excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations.

"Sec. 2. The last sentence of paragraph (1) of subsection (b) of section 43 of the Act entitled 'An Act to relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency, to provide emergency relief with respect to agricultural indebtedness, to provide for the orderly liquidation of joint-stock land banks, and for other purposes,' approved May 12, 1933, is amended to read as follows:

" 'All coins and currencies of the United States (including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations) heretofore or hereafter coined or issued, shall be legal tender for all debts, public and private, public charges, taxes, duties, and dues, except that gold coins, when below the standard weight and limit of tolerance provided by law for the single piece, shall be legal tender only at valuation in proportion to their actual weight.'

"Approved, June 5, 1933, 4:40 p. m."

be remedied. We learn from the preamble that "provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to .regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts." Accordingly, all such provisions are declared to be against public policy, and every obligation, heretofore or hereafter incurred, though it contain such provisions, shall be payable, dollar for dollar, in legal tender at the time of payment. Transactions for the sale or delivery of gold for industrial purposes are not within the evil to be remedied, and so are not within the statute. Cf. Executive Order of April 5, 1933, and August 28, 1933; Orders of the Secretary of the Treasury, December 28, 1933 and January 15, 1934; Emergency Banking Act of March 9, 1933, 48 Stat. 1, 2, § 3. An obligation to make delivery upon a *bona fide* sale is not fairly to be classified as an obligation "payable in money" (Joint Resolution, subdivision (b)), or so we now assume. But very definitely, the evil does include transactions whereby gold, coined or uncoined, is to be delivered in satisfaction of a debt expressed in terms of dollars, payment, not sale, being then the end to be achieved. As definitely, indeed more obviously, the evil includes transactions whereby a debt is to be discharged, not in bullion, but in dollars, if the number of the dollars is to be increased or diminished in proportion to the diminution or the increase of the gold basis of the currency. Both forms of obligation are illustrations of the very mischief that Congress sought to hit.

3. The argument is made that in the case now before us the currency called for by the contract is stated too

indefinitely to be translated, dollar for dollar, as required by the Resolution, into the legal tender of the hour. But the difficulty is quite imaginary. Things that are equal to the same thing are equal to each other. There is application for the maxim here. If the currency to be paid by the lessee is to be the equivalent of gold, and if the gold is to be the equivalent of a stated number of gold dollars of a particular weight and fineness, then the covenant to pay the currency is tantamount to a covenant to pay the dollars, and dollars of the stated standard. This is the obligation that respondent took upon itself when it became a party to these leases. It is, however, the very obligation that has been outlawed by the statute as a menace to the maintenance of our monetary system. *Norman* v. *Baltimore & Ohio R. Co., supra,* pp. 306, 311. "Dollar for dollar," the obligation for the payment of money conforming to the standard of the covenant is to be discharged with money of the standard established by the law.

4. The argument is made that covenants of this particular form are so rare and exceptional that the protection of the monetary system does not require their suppression, and that arbitrary suppression is inconsistent with the Fifth Amendment. How exceptional or rare they are, we have no means of ascertaining. For anything proved in the record or subject to judicial notice they may be illustrations, even if verbal variants, of a type common in the petitioner's business and indeed in many others. But the power of the Congress is not dependent upon the results of such a census. A particular covenant, if viewed in isolation, may have a slight, perhaps a trivial, influence upon the effectiveness and symmetry of a new monetary policy. The aggregate of many covenants, each contributing its mite, may bring the system to destruction. Rivulets in combination make up a stream of tendency that may attain engulfing power.

No principle of constitutional law, no dictate of fair dealing, lays a duty upon the Congress to single out for special treatment an individual or a few among the members of a common mass. Cf. *Purity Extract Co.* v. *Lynch,* 226 U. S. 192, 201. One cannot even say with reason that the effects of this particular covenant are to be classified as negligible. The lessee as the recipient of principal or income must accept payment from its debtors in the depreciated currency. It is injured, at least appreciably, if it is required to pay its creditors in dollars of a different standard. *Norman* v. *Baltimore & Ohio R. Co., supra,* p. 315. Receipts and disbursements are no longer on a common basis.

5. In last analysis, the case for the petitioner amounts to little more than this, that the effect of the Resolution in its application to these leases is to make the value of the dollars fluctuate with variations in the weight and fineness of the monetary standard, and thus defeat the expectation of the parties that the standard would be constant and the value relatively stable. Such, indeed, *is* the effect, and the covenant of the parties is to that exent abortive. But the disappointment of expectations and even the frustration of contracts may be a lawful exercise of power when expectation and contract are in conflict with the public welfare. "Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of the Congress, they have a congenital infirmity." *Norman* v. *Baltimore & Ohio R. Co., supra,* pp. 307, 308. To that congenital infirmity this covenant succumbs.

The decree of the Circuit Court of Appeals is accordingly                                          *Affirmed.*

MR. JUSTICE VAN DEVANTER, MR. JUSTICE MCREYNOLDS, MR. JUSTICE SUTHERLAND, and MR. JUSTICE BUTLER dissent.