**EMERY BIRD THAYER DRY GOODS CO. et al. v. WILLIAMS et al.**

**WILLIAMS et al. v. EMERY BIRD THAY-ER DRY GOODS CO. et al.**

Nos. 10853, 10854.

Circuit Court of Appeals, Eighth Circuit.

Nov. 6, 1939.

966

Former opinion, 98 F.2d 166, set aside.

William D. Whitney, of New York City, and Armwell L. Cooper, of Kansas City, Mo. (Frederick H. Wood, of New York City, Ellison A. Neel, William E. Kemp, and Wallace Sutherland, all of Kansas City, Mo., Harold F. McGuire, of Washington, D. C., Frank E. Atwood, of Jefferson City, Mo., Cravath, deGersdorff, Swaine & Wood, of New York City, and Cooper, Neel, Kemp & Sutherland, of Kansas City, Mo., on the brief), for appellants and appellees Emery Bird Thayer Dry Goods Co. and others.

Barton Corneau, of Boston, Mass. (Henry M. Channing, of Boston, Mass., Robert B. Caldwell, of Kansas City, Mo., Channing, Corneau & Frothingham, of Boston, Mass., and McCune, Caldwell & Downing, of Kansas City, Mo., on the brief), for appellees and appellants Moses Williams.

Paul R. Stinson, of Kansas City, Mo., amicus curiæ.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This case involves the applicability of the "Gold Clause" Joint Resolution of June 5, 1933, 48 Stat. 112, 113, U.S.C.A. title 31, Section 463, to a ninety-nine year lease of real estate executed in 1890. The case is here on cross-appeals. Plaintiffs-appellants are the assignee of the lease and the sublessee from the assignee. Defendants are the lessors. An earlier determination of these appeals (8 Cir., 98 F.2d 166, certificate to Supreme Court dismissed and motion to take up case on entire record denied 302 U.S. 651, 58 S.Ct. 269, 82 L.Ed. 505) was set aside on a petition for rehearing.

To understand the determinative issues on these cross-appeals which are necessary to our determination, a brief statement as to certain provisions of the lease, as to some of the (undisputed) evidence, and as to the decree entered by the trial court is required. The lease provided that, during the first seven years of the lease, the rental should be paid quarterly in designated amounts of dollars "in gold coin of the United States of the present standard of weight and fineness"—the last three quarterly payments of the seventh year being $6,000 in such gold coin. During the following ninety-two years of the lease, the lessee was required to satisfy the annual rent with "five hundred and fifty-seven thousand, two hundred and eighty (557,280) grains of pure, unalloyed gold, in four quarter-yearly instalments, each in advance, of one hundred and thirty-nine thousand, three hundred and twenty (139,320) grains each, * * the first delivery of such pure gold to be made on the First day of April, 1897.

"Provided, however, that the lessors may, from time to time, at their option, require in lieu of any such quarter-yearly delivery of pure, unalloyed gold, the payment at the time and place appointed for such delivery, of the sum of six thousand dollars ($6,000), in such lawful currency of the country as the lessors may designate." The lease was subject to forfeiture and the property to reentry, at the option of the lessors, upon failure of the lessee to perform any condition of the lease.

Up to January 1, 1934, all payments of rent were made by checks or drafts, which were accepted and cashed without question. By the above date, the Gold Clause Joint Resolution, the Emergency Banking Act of March 9, 1933, 48 Stat. 1, U.S.C.A. Title 12, Section 248 (n), and the order of the Secretary of the Treasury of December 28, 1933, had all become effective. Thus, on January 1, 1934, it became and ever since has been impossible for plaintiffs to deliver gold, as provided in the lease.

December 19, 1933, the lessors wrote demanding payment of quarterly rent due January 1, 1934, and thereafter, by delivery to them of 139,320 grains of pure gold or by "your bank check for a number of dollars equal to the amount which the government would then pay for a like amount to [of] newly mined gold." At that time and thereafter, the dollar value of the above grains of gold has been $10,158.75.

Under protest and duress of threats of forfeiture of the lease, payment of $10,158.-75 was made for each of the quarters in 1934 and for the first and second quarters of 1935. This action was filed May 15, 1935, seeking to enjoin defendants from attempting to forfeit the lease or to collect more than $6,000 as quarterly rental; and for recovery of the excess rental thereto-

fore paid under protest and duress. Plaintiffs pleaded an offer, pending the litigation, to pay $6,000 to lessors unconditionally and to pay the claimed excess rental to defendants or into court to be disposed of in accordance with the decree on the merits. By amended complaint, plaintiffs prayed that the court decree (1) the provision of the lease requiring delivery of gold to be unlawful and void; (2) that the quarterly rental would be satisfied by payment of $6,000 in lawful currency of the United States; (3) that defendants be enjoined from forfeiting or attempting to forfeit the lease so long as quarterly rent of $6,000 was promptly paid and the other covenants of the lease performed by plaintiffs; and (4) for general relief.

The answer and cross complaint denied the applicability of the Joint Resolution or other Acts to the lease; challenged their constitutionality, if applicable; and prayed a decree of forfeiture of the lease for non-delivery of gold since January 1, 1934.

The decree of the trial court held that the Joint Resolution was not applicable to the lease; that plaintiffs were not entitled to recover the excess rent paid to defendants and the excess rent deposited in court pendente lite; that the equivalent in value ($10,158.75 quarterly) of the gold in lawful currency would constitute compliance with the lease requirement for gold (this because gold was unobtainable); and denied forfeiture for failure to deliver gold, so long as gold remained unobtainable and the equivalent value in currency was paid.

The primary issue involved in the appeals is the applicability of the Joint Resolution. Upon the determination of that issue, depends which of the other issues are necessary to be considered. If the Resolution is applicable, there next comes the issue of constitutionality of the Resolu-

tion so applied. Whether the Resolution is applicable or not and whether, if applicable, it is or is not constitutional as so applied, there are other issues (though dependent upon determination as to such applicability or validity) which will be considered in order.

## I. Applicability of Joint Resolution.

For reasons of practical convenience, we treat this issue from the standpoint of the reasons urged by defendants why the Resolution is not applicable. If any one of these reasons is sound and excludes the lease from the Resolution that is enough. These contentions of defendants are, in essence, as follows:

(a) Under the lease, the rent was dischargeable by delivery of gold—as a commodity—with no option in lessee to substitute money for gold; .

(b) lessors' option to require payment of a fixed sum ($6,000 quarterly) in lieu of gold was never exercised—being merely an offer by lessee which gave rise to no duty or right;

(c) the Resolution applies only to United States money obligations payable in money of the United States and not to gold bullion rentals.

Each of these contentions has been ably presented but such separate treatment, while accentuating the immediate matter, has resulted in some entirely natural if not indeed unavoidable repetition of thought. Such procedure is not to be criticised in a brief or in an argument. If possible, it should be absent from an opinion. Therefore, we shall endeavor to treat all of the above matters in the course of one discussion instead of taking them up separately.

The lease provides [1] that the lessee shall "deliver to the lessors, as yearly rental for said demised premises," at indicated

---

[1] The full language of the lease provision as to rental is as follows:

"Said lessee covenants and agrees to deliver to the lessors, as yearly rental for said demised premises, at such office of the lessors, or their agent, or at such bank, in said city of Kansas City, or in the City of New York, or in the City of Boston, as the lessors may, from time to time, designate, Thirty-three Thousand Dollars ($33,000) in gold coin of the United States of the present standard of weight and fineness, in four quarterly yearly instalments, each in advance, of Eight Thousand Two Hundred and Fifty Dollars ($8,250) each, on the First days of April, July, October

and January, in each and every year during the first four years of this lease, the first delivery to be made on the First day of April, 1890; Eighty Thousand Dollars ($80,000) in such gold coin in four instalments as follows, namely:—Fifty-seven Thousand Five Hundred Dollars ($57,500) on the First day of April, 1894, Seven Thousand Five Hundred Dollars ($7,500) on the First day of July, 1894, Seven Thousand Five Hundred Dollars ($7,500) on the First day of October, 1894, and Seven Thousand Five Hundred Dollars ($7,500) on the first day of January, 1895, during the fifth year of this lease; Seventy-seven Thousand Dollars

places within the United States certain designated amounts of dollars "in gold coin of the United States of the present [April 11, 1890] standard of weight and fineness, in four quarterly yearly instalments, each in advance"—such method of payments to continue for seven years, that is, up to the payment due April 1, 1897. During the remainder of the time (ninety-two years), the annual rental was to be "Five hundred and fifty-seven thousand, two hundred and eighty (557,280) grains of pure, unalloyed gold, in four quarter-yearly instalments, each in advance, of one hundred and thirty-nine thousand, three hundred and twenty (139,320) grains each * * *. Provided, however, that the lessors may, from time to time, at their option, require in lieu of any such quarter-yearly delivery of pure, unalloyed gold, the payment * * * of the sum of six thousand dollars ($6,000), in such lawful currency of the country as the lessors may designate."

As contended by defendants, the above outlined provision of the lease as to rent (applicable to the period here involved) does require payment in bullion with an optional right in lessors alone to require currency as to any payments designated by them. Also, gold bullion is often dealt in purely as a commodity to be employed in commercial, trade, artistic or scientific uses. Also, gold in form of bullion is not dollars nor any kind of money.

However, the determination that this lease requirement of delivery of bullion is one for gold in a form which is not money but is susceptible of and often used for various purposes as a commodity, does not necessarily result in the conclusion that the Resolution cannot apply to this lease provision. This is true because gold has, in addition to the above uses, been (until recently and since this lease was executed) long employed as the basic money metal in this country as well as all of the important commercial nations of the world. It is this intimate relation of gold to money which introduces a decisive element in our problem here.

While the Resolution aims at money payments and was designed primarily to prevent payment of debts in gold coin and was not to prevent exchange of gold bullion, as a commodity, for services, goods or other things, yet this intimate relation of gold to money might well make it possible to accomplish the evil aimed at and covered by the Resolution if all contracts for gold bullion were deemed without the Resolution. Thus an easy circumvention of the Resolution would appear which certainly could be carried to the extent of paralysis of all usefulness of the Resolution as to future contracts and as to past contracts in so far as such medium of payment might be required therein.

 From this condition and from the legal duty to preserve both the full proper force of the Resolution on one hand and legitimate transactions in bullion on the other, has arisen a test stated and applied in Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 334–336, 57 S.Ct. 485, 81 L.Ed. 678. That test is the intention of the parties in making the contract for delivery of bullion. If that intention was to use gold bullion to stabilize

($77,000) in such gold coin in four instalments as follows, namely:—Fifty-six Thousand Seven Hundred and Fifty Dollars ($56,750) on the first day of April, 1895, Six Thousand Seven Hundred and Fifty Dollars ($6,750) on the first day of July, 1895, Six Thousand Seven Hundred and Fifty Dollars ($6,750) on the first day of October, 1895, Six Thousand Seven Hundred and Fifty Dollars ($6,750) on the first day of January, 1896, during the sixth year of this lease; Seventy-four Thousand Dollars ($74,000) in such gold coin, in four instalments as follows, namely:—Fifty-six Thousand Dollars ($56,000) on the first day of April, 1896, Six Thousand Dollars ($6,000) on the first day of July, 1896, Six Thousand Dollars ($6,000) on the first day of October, 1896, and Six Thousand Dollars ($6,000) on the first day of January, 1897, during the seventh year of this lease; and Five Hundred and Fifty-seven Thousand, Two Hundred and Eighty (557,280) grains of pure, unalloyed gold, in four quarter-yearly instalments, each in advance, of One Hundred and Thirty-nine Thousand, Three Hundred and Twenty (139,320) grains each, on the first days of April, July, October and January, in each and every year, during the remaining ninety-two (92) years of said period of ninety-nine (99) years, the first delivery of such pure gold to be made on the First day of April, 1897.

"Provided, however, that the lessors may, from time to time, at their option, require in lieu of any such quarter-yearly delivery of pure, unalloyed gold, the payment at the time and place appointed for such delivery, of the sum of Six Thousand Dollars ($6,000), in such lawful currency of the country as the lessors may designate."

the value of the dollar, the Resolution applies; if it was to obtain gold for uses in manufacture, arts or the like (without relation to money), the Resolution does not apply. As in all kinds of contracts, the intention of the parties is to be sought in the instrument itself and such enlightening circumstances as attended the making of the contract. We must consider the lease, "the situation of the parties, their business needs and expectations, in gauging their intention." Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 335, 57 S.Ct. 485, 488, 81 L.Ed. 678.

■ Study of the lease convinces that the provision for rent payment in bullion was made solely for the purpose of stabilizing the money value of the dollar rental. The lessors are trustees of a common law trust entitled Boston Ground Rent Trust. The lease term is ninety-nine years. During the first seven years of the term the rent was payable in "gold coin of the United States of the present [April 11, 1890] standard of weight and fineness." During these seven years, the annual rental (payable quarterly) was gradually reduced until, for the last three-quarters of the seventh year of the lease, the quarterly payments were each $6,000 "in such gold coin". At the beginning of the payments for the eighth year and thereafter for the remaining ninety-two years of the lease, the quarterly payments were to be by delivery of 139,320 grains of "pure, unalloyed gold" or, at option of lessors, $6,000 in any United States currency designated by them. The above 139,320 grains of pure, unalloyed gold correspond exactly with the amount of pure, unalloyed gold contained in $6,000 of United States gold coin of the weight and fineness when the lease was executed. Also, at that time gold dollars and other United States dollars were on a parity. In this situation, the natural conclusion is that the lessors were land owners striving to stabilize the rent value from depreciation, by change in the gold content of the dollar, during a period of ninety-two years rather than to obtain gold bullion for uses in manufacture, art or science.

This conclusion is confirmed by all of the evidence. From the beginning of the eighth year (April, 1897) until the January, 1934, payment, the rent was paid by bank check and so accepted by lessors without objection, inquiry, request by lessors for money payment under the option, or suggestion that gold be delivered. Throughout the correspondence, dealing with lessors' demand for gold beginning with the January, 1934, payment, occur expressions leaving no doubt that it was the intention of the parties to stabilize the rent in terms of exising gold dollar value and not to obtain gold for manufacturing or other uses. In the letter (December 19, 1933) making the first demand for gold rental, lessors state:

"One obvious purpose of the clause in the lease providing for deliveries of rental in grains of fine gold rather than in gold coin, or other currency, was to guard against alterations in monetary standards and such periods of panic and depression as would probably occur in the course of a century. Changes have now occurred, and, before the depression has passed, further changes seem sure to follow."

In subsequent letters, a willingness was expressed to accept the money value of the grains of gold. There is no suggestion in this entire record that lessors intended or wanted gold bullion for any use except as representative of gold dollars of the weight and fineness at the time the lease was executed. "This conclusion would be necessary though the first of the alternative forms of payment stood alone * * *." Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 336, 57 S.Ct. 485, 488, 81 L.Ed. 678.

The option in the lessors to require payment in a fixed dollar amount of currency emphasizes the above conclusion that gold money value rental was the only thing in the minds of the parties in fixing the various rentals.

That such character of contract is within the Joint Resolution is ruled by Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 57 S.Ct. 485, 81 L.Ed. 678, and Guaranty Trust Co. v. Henwood, 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266, and related "Multiple Currency" cases.[2]

The Holyoke case involved leases of real estate where the rental was "a quantity of gold which shall be equal in amount to fifteen hundred ($1500) dollars of the gold

---

[2] Chemical Bank & Trust Co. v. Henwood, 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266, and, the Bethlehem Steel Co. cases, 307 U.S. 265, 59 S.Ct. 856, 83 L.Ed. 1280.

coin of the United States of the standard of weight and fineness of the year 1894, or the equivalent of this commodity in United States currency"—the choice between the two kinds of payment being in the lessee. The lease before us is for delivery of a specified number of grains of pure, unalloyed gold—not so expressed but actually equal to and clearly determined by the pure, unalloyed gold content of $6,000 of United States gold coin as of April, 1890—or, at the option of lessors, by payment of $6,000 in such United States currency as lessors might designate. While different language is employed, the leases in both suits sought to stabilize the money value of rental by the gold content of the dollar as of a specified date. In each instance, a second method of payment in United States currency was provided. In the Holyoke case, the measure of currency was the equivalence to value of gold; here, such measure is a named number of dollars. In the Holyoke case the choice between the two payment methods was in the lessee; here, it is in the lessors. In intention, in practical consequence, and in legal effect (as to the Joint Resolution) the leases in the Holyoke case and the lease here are not distinguishable.

■ Defendants urge that the option to pay in currency was merely an offer by the lessee which gave rise to no right or duty; that such option was in the lessors; and that it was never exercised. This option was more than a mere "offer". It was a contract obligation defining the right of the lessors to demand currency and the duty of the lessee (on demand) to pay in currency. The fact that the lessors alone had the option and fact that the option had

never been formally exercised are not of controlling consequence. In the Guaranty Trust Company case, as here, the option as to medium of payment was in the lessor and that option was exercisable as to each separate and succeeding payment. In that case, the contention was presented that the option there had never been exercised. There the court held that the obligor in the bonds "was under obligation to hold itself prepared to pay United States money— or any one of the optional [foreign] currencies." 307 U.S. 247, 256, 59 S.Ct. at page 852, 83 L.Ed. 1266.

Defendants urge that the Guaranty Trust Company case is distinguishable because, in that case, there was a "fundamental obligation to pay money" while here there is a fundamental obligation to deliver bullion with merely an unexercised option in lessors to require money. That case defined "payable" (as used in the Resolution) to mean "capable of being paid" (307 U.S. 247, 256, 59 S.Ct. at page 852, 83 L.Ed. 1266) and the Holyoke case went as far as holding that an alternate right in the lessee to pay in bullion or currency was within the Resolution. In each of the cases[3] so far before the Supreme Court involving the Joint Resolution, the court has, both in determining validity of and application of the Resolution, discussed the "evil" sought to be remedied by it. In the Holyoke case, the Court held that this evil would include a lease where one medium of rent settlement was gold bullion, if the intention of the parties, in using such gold, was solely to stabilize the dollar value of the rent (300 U.S. 324, 335, 336, 338, 339, 57 S.Ct. 485, 487, 81 L.Ed. 678.)[4] We are

---

[3] Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352; Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 57 S.Ct. 485, 81 L.Ed. 678; Multiple Currency Cases, 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266 and 307 U.S. 265, 59 S.Ct. 856, 83 L.Ed. 1280.

[4] The Court said:

"By the first term of the alternative, there may be payment of the rent in the form of 'a quantity of gold which shall be equal in amount to $1500 of the gold coin of the United States of the standard of weight and fineness of the year 1894.' In this form there is no call for a stated number of ounces of fine gold, as if a goldsmith were providing for the uses of his business. The call is for gold that shall be as heavy and as fine as a stated number of gold dollars, with the

result that delivery in such dollars is a payment in strict accordance with the letter of the contract. We must consider the situation of the parties, their business needs and expectations, in gauging their intention. When these are kept in view, the gold is seen to be a standard with which to stabilize the value of the dollar; the dollar not a yardstick with which to measure the quantity of the gold. To read the leases otherwise is to permit the realities of the transaction, its substance and essential purpose, to be obscured by forms and phrases. Long ago it was said by a distinguished member of this court, commenting upon a different statute, but one analogous in purpose: 'If the contract is for the delivery of a chattel or a specific commodity or substance, the law does not apply. If it is bona fide for so many carats of diamonds

convinced that this lease is within the Joint Resolution.

## II. Validity.

Defendants urge the invalidity of the Resolution in so far as it may be applicable to leases requiring satisfaction of rent by delivery of bullion. The supporting argument is that the Constitutional power of Congress to coin money and regulate the value of domestic and foreign coin should be limited to matters which directly affect the efficient exercise of that power and should not extend to indirect effects—this in analogy to the similar rule concerning the limits of Congress to regulate commerce. That a bullion rent lease should be held as having no more than an indirect effect upon the money power of Congress and, therefore, outside such power.

■ The case of Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 306–316, 55 S. Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352, discussed elaborately and clearly the Constitutional limits of the money power and stated the Congressional action was subject to judicial inquiry only as to "whether its [Congress] action is arbitrary or capricious, that is, whether it has reasonable relation to a legitimate end." 294 U.S. page 311, 55 S. Ct. page 417, 79 L.Ed. 885, 95 A.L.R. 1352. The later Holyoke case declared the control of gold bullion contracts within that power where the bullion provision was solely a device to stabilize money value. 300 U.S. pages 340, 341, 57 S.Ct. 485, 81 L.Ed. 678.

These decisions would seem to make unnecessary any discussion of the principle to be applied. However, this point is so seriously pressed from a somewhat different standpoint that it is not out of place to examine the matter briefly. The Resolution itself clearly intended to cover "gold" as such. The language is leveled at obligations payable "in gold or a particular kind of coin or currency, * * *." Applying to our case the rule above quoted from the Norman case, has this inhibition against payment in gold—bullion—a "reasonable relation to a legitimate end"? The sole function of money is as a necessary medium of exchange in all commerce which has passed the barter stage. The vital relation of money to commerce is obvious.

■ The exclusive (Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 303, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352; Legal Tender Cases, Knox v. Lee, 12 Wall. 457, 545, 20 L.Ed. 287) power of Congress over money is the power to legislate wherever the welfare of the people is served by regulation of their medium of exchange. This power extends to certain bullions which are used as money metals in so far as is proper to control the effects of such bullion upon money.

■ For many years, this country has based its money upon gold or upon gold and silver. Throughout the civilized nations, one or the other of these precious metals has been the material from which their basic money was made and by which their monetary systems were standardized. We need go no further than the recent history of our own and other countries for illustration of the intimate connection of gold with money, both in domestic and in

---

or so many ounces of gold as bullion, the specific contract must be performed [assuming, of course, that contracts for the delivery of bullion are not prohibited by law]. But if terms which naturally import such a contract are used by way of evasion, and money only is intended, the law reaches the case.' Per Bradley, J., in Legal Tender Cases, 12 Wall. 457, 566, 20 L.Ed. 287. Here what was intended was to assure the payment of a money debt in dollars of a value as constant as that of gold. Norman v. Baltimore & Ohio R. Co., supra, 294 U.S. 240, at page 302, 55 S.Ct. 407, 413, 79 L.Ed. 885, 95 A.L.R. 1352; cf. Feist v. Société Intercommunale Belge D'Electricité, L.R. (1934) A.C. 161, 172, 173. The fact is of little moment that currency is characterized as a commodity in the verbiage of the covenant as long as it is currency. Cf. Lipke v. Lederer, 259 U.S. 557, 561, 562, 42 S.Ct. 549, 550, 551, 66 L.Ed. 1061. Weasel words will not avail to defeat the triumph of intention when once the words are read in the setting of the whole transaction. So read, the end to be achieved is shown forth unmistakably as a payment, not a sale.

"This conclusion would be necessary though the first of the alternative forms of payment stood alone in the indentures.

* * * * *

The Resolution touches gold as well as coin or currency whenever transactions in either are within the evil to be remedied.

* * * * *

But very definitely, the evil does include transactions whereby gold, coined or uncoined, is to be delivered in satisfaction of a debt expressed in terms of dollars, payment, not sale, being then the end to be achieved."

international usage—the efforts of various countries to remain on the gold standard; the struggle to get or keep gold; the governmental storing of enormous quantities of gold; and the effects upon domestic business and international business. All of these happenings were because of the use of gold as money or as a basis therefor. In view of all this, as well as of much more that might be set down, there can be no doubt of the constitutional power in the Congress to deal with gold in any proper way affecting the money of the country.

Under its power "to regulate the value thereof [money]", Congress has deemed it wise to allow payment in currency of past and future contract obligations calling for payment in "gold or a particular kind of coin [gold or otherwise] or currency." That Resolution has been upheld as to bonds calling for gold coin of specified weight and fineness without other optional payment (Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352); as to real estate leases calling for rent payment in gold, measured by gold dollars of specified weight and fineness with an option in the lessee to pay currency equivalent in value to such gold (Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 57 S.Ct. 485, 81 L.Ed. 678); and as to bonds payable in gold dollars of specified weight and fineness or in named amounts of foreign moneys (which were the equivalent of the dollar value when the bonds were issued), with option in the obligees as to medium of payment (Multiple Currency cases, 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266, and 307 U.S. 265, 59 S.Ct. 856, 83 L. Ed. 1280).

We must conclude that the power existed to control the situation where a long term lease called for rent payment in gold bullion, with an option in lessors to require payment in such United States currency as they may elect—it being determined that the gold rent was not for use of gold as a commodity but as a value stabilizer.

### III. Measure of Rent Due.

Although defendants argue that the trial court had no power to substitute gold value in currency for gold and that, since gold was not delivered, they had the right to forfeit the lease, yet they contend alternately that, if they must take currency, the amount thereof should be measured by—be equivalent to—the value of the required gold bullion at time of payment. Plaintiffs contend the payment should be the six thousand dollars quarterly made optional to lessors in the lease.

We uphold the contention of plaintiffs. The end to be accomplished by the Resolution was to prevent gold or gold dollar obligations from realizing the additional money values arising from gold contract mediums of payment. To allow currency payments equivalent to gold value (coin or bullion) would, of course, completely defeat the Resolution.

In the Holyoke case, supra, the lease expressly called for gold or "the equivalent of this commodity in United States currency." Clearly, an implied condition for such an equivalent would be within the reasoning and the result in the Holyoke case.

The only way in which the effect of the Resolution can be preserved is to hold that the obligation "shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts" —as expressed in the Resolution. Whether such "dollar for dollar" value is to be measured by the gold dollar value at the time the instrument was executed or by an optional or alternative currency payment expressed in the instrument—if such be different from such gold value—is not material here.[5] In this lease, the bullion rental was the exact equivalent of $6,000 in gold coin at the date of the lease (also, at the date the bullion payments were to begin) and the optional payment is $6,000 in currency.

### IV. Conclusion.

From what has been hereinbefore stated, it results, that the obligation to pay rent under this lease was, because of the effect of the Resolution, dischargeable by payment of $6,000 quarterly in lawful currency of the United States, beginning with

5 In the Norman case, supra, there was but one measure—gold dollars—prescribed, and currency dollars of like amount were held a discharge under the Resolution. In the Holyoke case, supra, an amount of gold equal to that contained in $1,500 of gold coin of a specified weight and fineness or currency equivalent to the value of such gold at time of payment were prescribed, and $1,500 in currency was held to discharge the obligation. In the Guaranty Trust Company case, supra, gold dollars or foreign money were specified, and currency equalling the number of gold dollars was held a discharge.

the payment due January 1, 1934, when the dispute as to medium of payment arose.

Six quarterly payments of $10,158.75 each were made to lessors, under protest as to the excess above $6,000, beginning January 1, 1934, and ending with the payment on April 1, 1935. Since commencement of this action (May 15, 1935), lessee has made quarterly payments into court of $10,158.75 plus $101.59 (this latter sum being one percentum of the main payment and intended to cover the statutory fee of the clerk)—the payments being in accordance with the proposition in plaintiffs' petition to pay $6,000 quarterly to lessors unconditionally and the disputed quarterly balance of $4,158.75 into court "in order that no question may arise concerning the full performance by plaintiffs of their obligations under the said lease" and to await distribution in accordance with the final decree.[6] These payments into court were purely voluntary by lessee and for its own protection.

The trial court decreed that plaintiffs were not entitled to refund of the excess rental paid under protest to lessors nor to any part of the impounded funds—ordering such funds to be paid by the clerk to lessors. Such provisions in the decree naturally and necessarily resulted from the view of the court that the Resolution did not govern the lease and that forfeiture of the lease was not justified.

Our contrary view as to the effect of the Resolution necessarily disposes of the forfeiture issue and also requires a different holding as to refund and as to disposition of impounded funds. As to the protested payments to lessors, the lessee is entitled to a refund of the excess quarterly sums of $4,158.75 with interest at six percentum from date of the respective payments until repaid. As to the impounded funds, the lessors are entitled to a sum equal to quarterly payments of $6,000 without interest (since they refused to accept the tendered payments of $6,000 quarterly); while lessee is entitled to the balance of the funds, less any statutory claims of the clerk, without interest (since these payments were voluntarily made by it for its own protection).

An order will be entered reversing the decree with instructions to enter a decree (1) enjoining lessors from interfering with the possession of lessee, its assigns or sublessees and the exercise of its rights under the lease so long as lessee, its assigns or sublessees promptly pay quarterly rental of $6,000 and comply with all other conditions and obligations of the lease and so long as the Joint Resolution remains in force as to the lease; (2) refund payments with interest and payment of impounded funds in accordance with this opinion; (3) assessment of costs in the trial court and on these appeals against defendants.

---

[6] Since defendants were then contending that the lease was forfeited by non-delivery of gold bullion, they refused to accept any rental so that the full amount of $10,158.75 plus clerk's fee was paid into court by lessee.